**Supreme Court**

No. 2013-15-Appeal.
(WC 10-406)
Dissent begins on page 19

Butterfly Realty et al.        :

v.        :

James Romanella & Sons, Inc.     :


Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Indeglia, for the Court.**  In this appeal, we revisit an ongoing dispute between two commercial landowners over the existence of a prescriptive easement used by delivery trucks to access a loading dock.  The plaintiffs, Butterfly Realty and Dairyland, Inc. (plaintiffs), appeal from a Superior Court judgment denying their claim for a prescriptive easement on the property of the defendant, James Romanella & Sons, Inc. (JR & Sons or defendant).  This case came before the Supreme Court on December 10, 2013, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  After hearing the parties' arguments and reviewing their written submissions, we are satisfied that cause has not been shown.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

The facts of this case were previously discussed in this Court's recent opinion, Butterfly Realty v. James Romanella & Sons, Inc., 45 A.3d 584 (R.I. 2012) (hereinafter, Butterfly I).  In

that decision, we vacated a judgment in favor of defendant and remanded the matter to the Superior Court. Upon remand, the parties waived the presentation of additional evidence. Accordingly, the facts provided in this opinion come from the one and only trial conducted in this case. We briefly recount below those facts relevant to the instant appeal.

The property at the center of this dispute consists of three commercial lots located in the Town of Westerly where East Avenue meets Granite Street and which are identified on assessor's plat No. 77 as lots Nos. 330, 331, and 332. JR & Sons owns the most southerly of the three parcels, lot No. 330, which has frontage on East Avenue. At all times relevant to this appeal, a commercial building containing a laundromat has occupied the northern portion of lot No. 330. Lot No. 331, which is owned by Dairyland, Inc., lies immediately to the north of lot No. 330 and has frontage on Granite Street. Lot No. 332 sits immediately to the north of lot No. 331 and also has frontage on Granite Street. On August 8, 1985, Albert Romanella, then-president of JR & Sons, conveyed lot No. 332 by warranty deed to Butterfly Realty (Butterfly). That same day, Albert Romanella also assigned his lease for lot No. 331 to Butterfly.

Butterfly owns a single commercial building that occupies most of lots Nos. 331 and 332.[1] The southwestern corner of the building houses a loading dock, the door to which faces southward towards JR & Sons's lot. Because the building sits nearly on top of the boundary line between lots Nos. 331 and 330, delivery trucks cannot access the loading dock without entering onto JR & Sons's property. Accordingly, on August 16, 1985, JR & Sons granted Butterfly an express easement, recorded in the Town of Westerly's land evidence records, which "permit[s] ingress and egress to and from the loading dock at the southwest corner of [Butterfly's] building[.]" The terms of the easement, however, expressly prohibit deliveries by "semi-

---

[1] Part of the southwest corner of the building actually encroaches upon JR & Sons's lot No. 330.

- 2 -

trailers." The southern boundary of the easement runs roughly parallel to the side of Butterfly's building and becomes wider as it moves from east to west.

From 1985 onward, Butterfly's building housed a succession of businesses, all of which made some use of the loading dock. A liquor store operated out of the building from 1985 to 1989. After the liquor store vacated the premises, Butterfly leased a portion of the building to an auto parts store. From 1993 through 2010, another tenant of Butterfly's, Auto Audio, also operated a business out of a different portion of the building. The various businesses received deliveries from trucks of different sizes and with differing frequencies. In general, however, the delivery trucks would drive over JR & Sons's lot, beyond the bounds of the express easement, to access the loading dock.

In May 2010, JR & Sons hired an engineer to determine the precise location of the express easement's southern boundary after a delivery truck damaged a building on JR & Sons's lot. JR & Sons then ordered the installation of "concrete pylons" along the southwestern boundary of the express easement. With the pylons in place, it was nearly impossible for delivery vehicles to directly access the loading dock. On June 14, 2010, Butterfly[2] responded by filing a complaint in Washington County Superior Court, claiming a prescriptive easement over JR & Sons's lot.[3] The defendant filed a counterclaim for a permanent injunction to compel Butterfly to comply with the terms of the express easement.

A two-day bench trial on the parties' claims commenced on December 8, 2010. The testimony and exhibits presented at trial indicated that delivery trucks typically used one of two routes to access the loading dock. These two paths were referred to as the "brown route" and the

---

[2] A later amended complaint included Dairyland, Inc. as a plaintiff.
[3] Butterfly and Dairyland also filed claims for an implied easement, an easement by necessity, an easement by implication, an easement by acquiescence, and adverse possession. The only claim before the Court in the instant appeal is plaintiffs' claim for a prescriptive easement.

"green route" at trial.  See Appendix.[4]  When following the brown route, a truck would enter lot No. 330 from a curb cut on East Avenue and then drive westward, in between the laundromat and the Butterfly building, before making a left turn behind the laundromat.  The delivery truck would then back up to the loading dock.  When using the green route, a delivery truck would enter lot No. 331 from a curb cut on Granite Street, then drive southwestward across several painted parking spaces,[5] and cross onto lot No. 330, where it would continue along the brown route to reach the loading dock.  At trial, both parties presented several witnesses who testified about the delivery trucks' use of JR & Sons's lot.  We summarize below the relevant testimony.[6]

Shawn Martin, a part-owner of Butterfly, testified on behalf of plaintiffs.  He explained that his partner, an attorney, had negotiated the exact terms of the express easement in 1985 but stated that he "roughly" understood where the boundaries of the express easement were located.  According to Mr. Martin, neither Albert Romanella nor Albert Romanella's partner, Charles Sposato, had ever voiced any objections about the delivery trucks' use of lot No. 330 to access the loading dock.

The plaintiff also presented Mr. Martin's wife, Rita Martin, who managed the liquor store from the time it opened in 1985 until the time it closed in 1989.  During the many hours that she spent at the store, Mrs. Martin personally observed trucks make deliveries to the loading dock.  She estimated that the liquor store received approximately twelve to fifteen deliveries per week.  Mrs. Martin further estimated that the trucks' use of the brown and green routes was either roughly equal or that the brown route received slightly more use than the green route.  She indicated that she had never received any written or oral communications from anyone affiliated

---

[4] An engineering drawing, appended to this opinion, depicts the "brown" and "green" routes testified to at trial.  The express easement appears on the drawing as a dotted line.
[5] Some of the parking spaces actually straddle the boundary line between lots Nos. 330 and 331.
[6] Three pretrial depositions were additionally admitted into evidence as full exhibits.

with JR & Sons about the delivery trucks' use of lot No. 330 to access the loading dock. Mrs. Martin testified that she and her husband had a "friendly relationship" with Mr. Sposato.

Mrs. Martin explained that, for approximately one month each year, one or more tenants of JR & Sons would sell Christmas trees alongside the northern exterior wall of the laundromat. She testified that the actual dimensions of the area occupied by the trees would vary slightly from one year to another. Nonetheless, according to her recollection, the trees never impeded the trucks' abilities to make deliveries.

Paul Williams also testified on plaintiffs' behalf. Mr. Williams worked in the auto parts store from 1991, approximately two years after the store opened, until 2006.[7] He explained that the auto parts store usually received deliveries at the loading dock on a weekly basis. According to Mr. Williams, those deliveries arrived by semi-trailer trucks which were approximately fifty feet in length. He also testified that sometimes a garbage truck would pick up trash from the loading dock or a United Postal Service (UPS) truck would deliver a large item to the loading dock. Mr. Williams estimated that the delivery trucks' use of the brown and green routes was roughly equal, but he clarified that a truck driver's ability to use the green route depended on whether cars were parked in the parking spaces located southeast of Butterfly's building. See Appendix. Mr. Williams testified that the annual Christmas tree sales did not prevent the delivery trucks from entering through the curb cut on East Avenue and reaching the loading dock.

---

[7] The record is somewhat vague concerning delivery trucks' use of lot No. 330 during the time period from 1989 to 1991. As we explained in our previous opinion, this ambiguity is not necessarily fatal to plaintiffs' claim because the time from 1991 forward could satisfy the statutory ten-year period for a prescriptive easement. See Butterfly Realty v. James Romanella & Sons, Inc., 45 A.3d 584, 587 n.2 (R.I. 2012)

The plaintiffs' final witness was Craig Jackson, the owner of Auto Audio. Mr. Jackson testified that he personally supervised about half of Auto Audio's deliveries. According to Mr. Jackson, UPS trucks made deliveries to the loading dock about twice per day and used both the brown and green routes. Approximately once every two weeks, a garbage truck would use the loading dock to pick up both Auto Audio's and the auto parts store's trash. Consistent with Mr. Williams's testimony, Mr. Jackson testified that he observed semi-trailer trucks accessing the loading dock on a weekly basis to make deliveries to the auto parts store. He confirmed that the average size of the area occupied by the Christmas trees varied from year to year but maintained that the only time he could recall deliveries being impeded is when the concrete pylons were installed in 2010.

Charles Sposato, a 50 percent owner of JR & Sons, testified for defendant. In a deposition submitted into evidence at trial, Mr. Sposato stated that he was unaware of the exact location of the express easement until May 2010 when the survey was completed. Mr. Sposato further indicated in his deposition that he had previously believed that Albert Romanella had an oral, rather than a written, agreement with Butterfly that delivery trucks were allowed to cross over JR & Sons's property to reach the loading dock. Accordingly, he testified at trial that he was surprised in May 2010 when he saw for the first time the deed granting Butterfly an express easement. He insisted that, since 1985, he had consistently believed that Butterfly should pay for its use of JR & Sons's lot. Approximately twenty-five years ago, he expressed this belief to Albert Romanella. After Albert Romanella passed away in 2004, Mr. Sposato considered requesting that Butterfly pay rent but ultimately did not approach anyone from Butterfly at that time. He did not demand rent from anyone at Butterfly until approximately six months before trial when he telephoned Paul Martin, Shawn Martin's brother. According to Mr. Sposato's

recounting of the telephone conversation, he requested that Butterfly pay $900 per month for its tenants' use of lot No. 330.

According to Mr. Sposato, delivery trucks had more than once caused damage to JR & Sons's property. On those occasions, Mr. Sposato spoke directly with the drivers of the trucks, but he did not tell anyone from Butterfly, Dairyland, or the auto parts store that the delivery trucks could no longer use JR & Sons's lot. When asked at trial why he never forbade the delivery trucks from entering upon JR & Sons's property, Mr. Sposato explained, "I just wanted to be a good neighbor I guess. I just never did."

Mr. Sposato also testified about his personal observations of the delivery trucks' use of JR & Sons's lot. He indicated that, since 1995, he has visited JR & Sons's property on a daily basis, except for several weeks each year that he spends in Florida. During his time at the property, Mr. Sposato personally observed semi-trailer trucks making deliveries to the loading dock. According to Mr. Sposato, the trucks mostly used the brown route. He clarified, however, that there are "many different trucks that come [into] this property. They are not all trailer trucks. They don't all use that brown [route] at all. * * * They come in our property * * * all ways that I have noticed." Mr. Sposato recalled a dozen or more instances when he had moved his car to accommodate the delivery trucks. He explained that the truck drivers did not ask him to move his car, but he would voluntarily do so if he noticed that the trucks were holding up traffic. Mr. Sposato confirmed that the Christmas tree sales took place on the northern side of the laundromat almost every year from 1985 to 2006 and lasted from approximately Thanksgiving through December 23 or 24.

James Romanella also testified for defendant. James[8] served as vice president of JR & Sons until 2004, when he became president. He recalled a telephone conversation that he had with the manager of the auto parts store about the Christmas trees. According to James's recounting of the conversation, the manager was concerned that the size of the area occupied by the trees was making it difficult for the delivery trucks to reach the loading dock. In response, James suggested that the delivery drivers use smaller trucks. He also informed the manager that the tree sales "would continue as long as [his] tenant wanted to do it." James had no recollection of when this conversation occurred other than that it had taken place sometime between 1985 and 2005.

The trial justice denied plaintiffs' claim for a prescriptive easement in a written decision filed on March 18, 2011. The plaintiffs appealed to this Court. In an opinion issued on June 27, 2012, we concluded that the trial justice had committed an error of law because he "inappropriately required Butterfly's tenants' use of the disputed land to be inconsistent with JR & Sons's use * * *." Butterfly I, 45 A.3d at 589. Accordingly, we vacated the trial justice's decision and remanded the matter for further proceedings. Id. at 592. We additionally instructed that on remand the trial justice should address certain inconsistent findings he had made with regard to the Christmas trees' impact on Butterfly's continuous use of the prescriptive easement. Id. at 591. Finally, we directed the trial justice to determine whether the various tenants' use of lot No. 330 could be imputed to Butterfly for the purposes of establishing a prescriptive easement. Id. at 591-92.

Upon remand and after the parties waived the presentation of additional evidence, the trial justice issued a second written decision on November 9, 2012 in which he again denied

---

[8] To avoid confusion, we refer to James Romanella by his first name. In so doing, we intend no disrespect.

- 8 -

plaintiffs' claim for a prescriptive easement. In his second decision, the trial justice found that the delivery trucks' use of lot No. 330 was actual, open, and notorious. He concluded, however, that such use was not sufficiently hostile to establish an easement by prescription. According to the trial justice, JR & Sons had given permission for the delivery trucks to traverse its lot in order to access the Butterfly building's loading dock. He also concluded that the Christmas tree sales had interrupted the continuous use of the disputed area. The trial justice did not address whether the various tenants' use of lot No. 330 could be imputed to Butterfly.

Judgment entered on November 20, 2012. The plaintiffs timely appealed to this Court. Additional facts will be provided, as needed, to resolve the issues raised on appeal.

## II

## Standard of Review

We afford "much deference to the factual findings of a trial justice sitting without a jury in a civil case." DiPippo v. Sperling, 63 A.3d 503, 507 (R.I. 2013) (quoting McGarry v. Coletti, 33 A.3d 140, 144 (R.I. 2011)). We will not disturb the trial justice's factual findings "unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties." Greensleeves, Inc. v. Smiley, 68 A.3d 425, 433-34 (R.I. 2013) (quoting Grady v. Narragansett Electric Co., 962 A.2d 34, 41 (R.I. 2009)). "If the trial justice's decision 'reasonably indicates that [he or she] exercised [his or her] independent judgment in passing on the weight of the testimony and the credibility of the witnesses it will not be disturbed on appeal unless it is clearly wrong or otherwise incorrect as a matter of law.'" Cahill v. Morrow, 11 A.3d 82, 86 (R.I. 2011) (quoting Now Courier, LLC v. Better Carrier Corp., 965 A.2d 429, 434 (R.I. 2009)). Furthermore, the trial justice may "draw inferences from the testimony of witnesses, and such

inferences, if reasonable, are entitled on review to the same weight as other factual determinations." Id. (quoting DeSimone Electric, Inc. v. CMG, Inc., 901 A.2d 613, 621 (R.I. 2006)). In contrast, "we review de novo the trial justice's conclusions of law." Greensleeves, 68 A.3d at 434 (citing State v. Gianquitti, 22 A.3d 1161, 1165 (R.I. 2011)).

## III

## Discussion

A few years ago, this Court observed that the "ancient roots and arcane rationale" of prescriptive land rights have become increasingly difficult to "square[] with modern ideals in a sophisticated, congested, peaceful society." Cahill, 11 A.3d at 88, 87 (quoting Finley v. Yuba County Water District, 160 Cal.Rptr. 423, 427 (Cal. Ct. App. 1979)). Although claims for adverse possession and prescriptive servitudes have continuing vitality in this jurisdiction, our jurisprudence on prescriptive rights in recent years has charted a consistent path by showing solicitude for the rights of record owners, and, correspondingly, guarding against the potential for uncompensated loss by holding claimants to a high burden of proof. See Drescher v. Johannessen, 45 A.3d 1218, 1227 (R.I. 2012); Cahill, 11 A.3d at 88; see also Pelletier v. Laureanno, 46 A.3d 28, 35-36 (R.I. 2012) (rejecting claim for easement appurtenant). A claimant of an easement by prescription "must show actual, open, notorious, hostile, and continuous use under a claim of right for at least ten years." Drescher, 45 A.3d at 1227 (quoting Hilley v. Lawrence, 972 A.2d 643, 651-52 (R.I. 2009)). A plaintiff claiming an easement is held to a higher standard of proof than a plaintiff in an ordinary civil case. Pelletier, 46 A.3d at 35. He or she bears the heavy burden of proving "each element by a preponderance of clear and convincing evidence." Carpenter v. Hanslin, 900 A.2d 1136, 1146 (R.I. 2006); see also Hilley,

972 A.2d at 652 (each element for a prescriptive easement must be proven by "clear and satisfactory evidence").

Any analysis of a claim for a prescriptive right must take for its point of origin the principle that such rights "are not favored in the law, * * * since they necessarily work corresponding losses or forfeitures on the rights of other persons[.]" Drescher, 45 A.3d at 1227 (quoting 25 Am.Jur.2d Easements and Licenses § 39 at 536 (2004)); Butterfly I, 45 A.3d at 592 n.8 (stating same). "The burdens of prescription * * * fall onto the shoulders of the subservient estate." William G. Ackerman & Shane T. Johnson, Outlaws of the Past: A Western Perspective on Prescription and Adverse Possession, 31 Land & Water L. Rev. 79, 92 (1996). Those burdens include the "infringement of a landowner's rights, a decrease in value of the servient estate, * * * the generation of animosity between neighbors, a source of damages to land * * * and the creation of uncertainty for the landowner." Cahill, 11 A.3d at 87-88 (quoting Ackerman, 31 Land & Water L. Rev. at 92).

These foundational principles are equally applicable when the holder of an express easement seeks to expand that easement by prescription. An attempt by the holder of an express easement to unilaterally "expand the physical size, purpose or use of the easement beyond the terms as contained in the original grant * * * unduly interferes with the reserved rights of the owner of the servient tenement." 28A C.J.S. Easements § 231 at 449 (2008). In cases such as this one where the easement holder seeks to change not only the frequency or type of use, but also the dimensions of an express easement, the enlargement "'does more than merely increase the burden upon the servient estate; it has the effect of enveloping additional land,'"—land which the owner has purposely reserved for him or herself. Northwest Pipeline Corp. v. Luna,

241 P.3d 945, 948 (Idaho 2010). Here, Butterfly seeks to expand a limited express easement into an amorphous prescriptive easement that will envelop nearly the entirety of JR & Sons's lot.[9]

An enlargement of an express easement by prescription must satisfy all the traditional requirements for acquiring a prescriptive right. See Jon W. Bruce & James W. Ely, Jr., The Law of Easements and Licenses in Land, § 8:16 (2014).[10] In the instant case, the trial justice found that Butterfly had failed to prove by clear and convincing evidence that its use was hostile to the record owner or that it was continuous for the statutory period. Butterfly challenges both of these findings on appeal. Before turning our attention, however, to the merits of the trial justice's analysis of the element of hostility, we briefly address plaintiff's threshold contention that the trial justice was prohibited upon remand from performing any analysis of the element of hostility.

---

[9] Despite the designation of the "brown" and "green" routes, the witnesses' collective testimony at trial clearly indicated that trucks took all different paths to navigate around the maze of cars, Christmas trees, buildings, and other obstacles that from time to time littered this small parking lot. Accordingly, although Butterfly attempts to confine its claimed easement to the "brown" and "green" routes, the reality is that every time a large truck tries to navigate those pathways and finds a car or other obstacle in its way, it will stray from the designated routes and envelop even more of JR & Sons's property. Granting such an easement would be difficult to square with "this Court's obligation to create the least burdensome easement possible[.]" Reitsma v. Pascoag Reservoir & Dam, LLC, 774 A.2d 826, 839 (R.I. 2001) (Goldberg, J., dissenting).

[10] It has been said that "[e]nlargement by prescription of an express easement is rare" due to "a lack of the elements necessary to create it." Turner v. Bouchard, 32 A.3d 527, 534 (Md. Ct. Spec. App. 2011) (quoting Annot. 110 A.L.R. 915, 916 (1937)). For example, in a case factually similar to the one presently before this Court, a commercial landowner had an express easement, dating back to 1910, over part of the neighboring defendant's property to allow trucks to access a loading dock. Mensch v. Netty, 408 N.W.2d 383, 384 (Iowa 1987). Modern-sized trucks and semi-trailers, however, could not back up to the loading dock within the narrow bounds of the express easement and therefore began to encroach farther onto the defendant's land. See id. at 384-85. After a truck damaged the defendant's building, the defendant refused to permit the trucks to continue to use his land to reach the loading dock. See id. at 385. Consequently, the plaintiff sought to establish that he had acquired a prescriptive easement for the additional footage. See id. The Iowa Supreme Court held that the plaintiff could not meet his burden of proof on the element of hostility because "[t]he fact that truck drivers had used the additional space to enter the alley at most shows permissive use." Id. at 387.

## A

## Scope of Remand

According to Butterfly, the trial justice exceeded the scope of this Court's remand by revisiting the element of hostility. Butterfly argues that this Court had "already ruled that the trial justice had applied an incorrect legal standard in determining whether Butterfly had proven hostility, and did not invite the trial justice to revisit this element of proof."[11]

As we have explained, "lower courts * * * that receive our remand orders may not exceed the scope of the remand or open up the proceeding to legal issues beyond the remand." Pleasant Management, LLC v. Carrasco, 960 A.2d 216, 223 (R.I. 2008) (quoting Willis v. Wall, 941 A.2d 163, 166 (R.I. 2008)). "When a case has been once decided by this [C]ourt on appeal, and remanded to the [Superior Court], * * * [the Superior Court] * * * cannot * * * intermeddle with it, further than to settle so much as has been remanded." Id. (quoting United States v. Thrasher, 483 F.3d 977, 981 (9th Cir. 2007)).

We see no reason why our conclusion in Butterfly I that the trial justice made an error of law would prohibit the trial justice from revisiting the element of hostility. To the contrary, our previous opinion stated that the trial justice's "misapplication of law sufficiently tainted the balance of [his] decision, including any factual determinations." Butterfly I, 45 A.3d at 590. We therefore conclude that the trial justice was not only authorized but indeed was intended upon remand to apply the correct legal standard to the facts to make a second determination as to whether Butterfly had proven hostile use.

---

[11] Butterfly additionally suggests that the trial justice based his second decision on a legal theory that was never argued. The record belies this assertion because JR & Sons argued permission from the outset of this case. In his opening statement on the first day of trial, JR & Sons's counsel took the position that Butterfly's use was permissive.

# B

## Hostility

In his second decision, the trial justice found that Butterfly could not meet its burden of proof on the element of hostility because its delivery trucks' use of JR & Sons's property was permissive. The claimant of an easement by prescription bears the burden of proving by clear and satisfactory evidence that his or her use was adverse to that of the record owner. To demonstrate hostile use, the claimant must show use "without permission asked or given * * * such as would entitle the owner to a cause of action against the intruder [for trespass]." Drescher, 45 A.3d at 1228 (quoting Tavares v. Beck, 814 A.2d 346, 351 (R.I. 2003)). On the issue of permission, this Court long ago articulated the relevant rule as follows:

> "It is the well settled rule that use by expressed or implied permission or license, no matter how long continued, cannot ripen into an easement by prescription, since one of the elements essential to the acquisition of the easement, namely, user as of right, as distinguished from permissive use, is lacking." Tefft v. Reynolds, 43 R.I. 538, 542-43, 113 A. 787, 789 (1921).

Since this pronouncement in Tefft, this Court has continuously acknowledged that express or implied permission defeats a claim for a prescriptive right. See Burke-Tarr Co. v. Ferland Corp., 724 A.2d 1014, 1019 (R.I. 1999) (distinguishing landowner's "express or implied permission," which will defeat a claimed easement, from landowner's mere awareness, which will not); cf. Reitsma v. Pascoag Reservoir & Dam, LLC, 774 A.2d 826, 834 (R.I. 2001) (concluding that "permission, express or implied, was never given" for claimant's use of landowner's property).

For a landowner who wishes to be an accommodating neighbor without creating a permanent burden on his or her land, "[t]he easiest remedy * * * is to give [the adverse user] permission to continue the use * * *. This effectively eliminates the adverse individual's claim immediately." Ackerman, 31 Land & Water L. Rev. at 95. One of the most well-recognized

- 14 -

dangers of prescriptive easements is their tendency to "discourage[] neighborly conduct and accommodation. Landowners are required either to formalize permissive arrangements, or to prevent use by others to avoid the risk that rights will be established by prescription." Restatement (Third) Servitudes, § 2.17 cmt. c at 265-66 (2000). The more formal a reviewing court requires that permission to be, the greater the uncertainty for the landowner. See Ackerman, 31 Land & Water L. Rev. at 95.

While this Court has required something more than silent acquiescence to show that a use was permissive, see Burke-Tarr Co., 724 A.2d at 1019, a landowner need not formally or expressly grant a user permission since "[p]ermission sufficient to preclude a claim for a prescriptive easement * * * may be inferred from surrounding circumstances." 28A C.J.S. Easements § 45 at 245 (2008); see Burke-Tarr Co., 724 A.2d at 1019 (acknowledging that "an inference of permissive use * * * would defeat the element of hostile use"). For example, in Drescher, this Court concluded that a claimant's use of a right-of-way was permissive, where the facts and circumstances supported an inference that the claimant's use was pursuant to a "'perceived invitation.'"[12] Drescher, 45 A.3d at 1228-29 (emphasis added); see also Daniels v. Blake, 81 R.I. 103, 109, 99 A.2d 7, 11 (1953) ("friendly relations between respondent and complainants while the latter were openly using the strip to pass to and from the shore * * * tends to establish their use originally as merely permissive").

Even where the issue of permission is raised, the burden is never on the landowner to demonstrate that the use was permissive. See Altieri v. Dolan, 423 A.2d 482, 483 (R.I. 1980).

---

[12] In Drescher v. Johannessen, 45 A.3d 1218 (R.I. 2012), we additionally concluded that the trial justice appropriately considered the fact that neighbors and individuals other than the claimant had accessed the landowner's property while under the "impression" that their use was permissive. See id. at 1229. We held that these facts in Drescher supported an inference of permission sufficient to defeat the claimed easement despite the fact that the permission was "illusionary" rather than actual. Id.

- 15 -

The burden at all times remains on the claimant to establish adverse use by strict proof. See id. "The determination of whether the claimant [of a prescriptive right] sustained this burden of proof involves an exercise by the trial justice of his factfinding power." Jerry Brown Farm Association, Inc. v. Kenyon, 119 R.I. 43, 52, 375 A.2d 964, 968-69 (1977); see Hazard v. East Hills, Inc., 45 A.3d 1262, 1271 (R.I. 2012) (claims for prescriptive rights are "fact-intensive inquir[ies]"). Accordingly, the deference that this Court affords the trial justice is at its zenith. Even if more than one inference may be drawn from the record, we are bound to uphold the trial justice's inferences so long as they are reasonable. Jerry Brown Farm Association, Inc., 119 R.I. at 51, 375 A.2d at 968. We conclude that the record in this case supports the trial justice's reasonable inference that Butterfly's use of JR & Sons's lot was permissive.

Viewing the record from the proper deferential perspective, the testimony demonstrated that Charles Sposato—unaware of the boundaries of the express easement—begrudgingly allowed Butterfly to use his property for nearly twenty-five years, due, at least in part, to his belief that Albert Romanella had given oral permission for Butterfly's trucks to traverse JR & Sons's lot. Mr. Sposato consciously refrained from requesting any compensation from Butterfly for those twenty-five years. Since Mr. Sposato apparently believed that Butterfly had already received an explicit oral grant of permission from Albert Romanella to use JR & Sons's lot, he could not reasonably be expected to have given Butterfly another express or formal grant of permission. Nor does the law require him to have done so. JR & Sons's behavior did, however, go beyond mere tolerance and awareness. Mr. Sposato and James Romanella took affirmative steps consistent with an inference of permission. Mr. Sposato moved his car to allow the trucks

access to the loading dock.[13] When the manager of the auto parts store called to complain about the Christmas trees, James Romanella did not prohibit the trucks from entering while the trees were in place but instead responded by insisting that the trucks' use of the lot must remain subservient to his tenants' use of the lot. When his building was struck in 2001 and again in 2004, James had two separate conversations with Paul Martin, in which Mr. Martin apologized and promised James on each occasion that it would not happen again. After these conversations, James continued to allow Butterfly's trucks to use JR & Sons's property for nearly another six years. Mr. Sposato explained that he never forbade the delivery trucks to enter JR & Sons's lot because he was trying to be a good neighbor.

This series of interactions adequately supports the trial justice's conclusion that JR & Sons "permitted the use to continue" by giving its "assent, accompanied with various restrictions, [to] control[] the use of the area." Such actions go beyond the "inactive status of quiescence or unqualified submission" which we have previously found insufficient to support an inference of permission. Reitsma, 774 A.2d at 832-33 (quoting Garrett v. Gray, 266 A.2d 21, 27-28 (Md. 1970)). The trial justice therefore correctly concluded that Butterfly had not met its burden of clearly and convincingly proving its claim for a prescriptive easement. "A prescriptive easement cannot be established if permission to use the property can be inferred where the relationship between the parties is one of neighborly cooperation and accommodation." 28A C.J.S. Easements § 45 at 245. The element of "hostility" does not refer to the emotional

---

[13] Although Mr. Sposato's testimony about moving his car is difficult to follow, he explained that sometimes Butterfly's delivery trucks would enter JR & Sons's property south of the laundromat. The trucks would then reverse direction in front of his office and back up to the loading dock, passing roughly in between the office and the rear of the laundromat. Since Mr. Sposato's car was parked near the southwest corner of the laundromat, he would occasionally have to move it to allow the delivery trucks sufficient room to maneuver. On the appendix, JR & Sons's office appears as a building marked "1 st[or]y masonry plaza."

temperature of the neighbors' relationship.  See Butterfly I, 45 A.3d at 589.  Thus, the fact that Mr. Sposato and James Romanella may have accommodated Butterfly's trucks with less than enthusiasm and alacrity does not turn a permissive use into a hostile one.[14]

After their building was damaged one time too many, Mr. Sposato and James Romanella investigated the boundaries of the express easement in May 2010 and decided that they would no longer permit Butterfly's uncompensated use of JR & Sons's property beyond those boundaries. Accordingly, they asked for monthly rent and installed the pylons, which actions prompted Butterfly to file suit almost immediately.  JR & Sons's revocation of permission does not suffice to prove hostility.  If it did, a landowner such as JR & Sons who has previously permitted someone to use his or her property would be placed in the untenable position of either allowing the use to continue indefinitely or revoking permission and suffering the imposition of a permanent burden on his or her property.  Under our law, a landowner who has previously permitted a neighbor to use his or her land is entitled to withdraw that permission without forfeiting his or her property rights.  See Hilley, 972 A.2d at 652 (where use of easement was permissive until such time as landowner withdrew permission, user who filed suit immediately after revocation of permission could not establish claim to a prescriptive easement). Accordingly, JR & Sons was free to end Butterfly's use of its lot, and its previous cooperation does not work a forfeiture of its rights.

In sum, we are satisfied that, in his second decision, the trial justice gave an accurate recitation of the law on hostility and drew a reasonable inference that Butterfly's delivery trucks' use of JR & Sons's lot was permissive.  Since Butterfly cannot succeed on its claim for a

---

[14] We note that there was testimony from both Mr. Sposato and Mrs. Martin that their relationship, at least prior to May 2010, was friendly and neighborly.  On appeal, we are required to afford "substantial deference" to a trial justice's decision to credit a witness's testimony. Pelletier v. Laureanno, 46 A.3d 28, 39 (R.I. 2012).

prescriptive easement without satisfying all of the requisite elements, our agreement with the trial justice's finding that Butterfly failed to meet its burden of proof on the element of hostility suffices for us to uphold his decision. We therefore need not address Butterfly's argument that the trial justice erroneously concluded that the annual Christmas tree sales interrupted the delivery trucks' continuous use of JR & Sons's lot.

## IV

## Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court. The papers in this case may be remanded to that tribunal.


**Goldberg, J., with whom Suttell, C.J., joins, dissenting.** Because I believe that there was sufficient evidence to show the plaintiffs' hostile use of the disputed area, and that no evidence was presented to support the trial justice's finding of implied permission to defeat such hostile use in this case, I respectfully dissent.

The discord in this case finds its genesis in the fact that on August 8, 1985, Albert Romanella conveyed a large commercial building that encroaches upon—and which has a loading dock that cannot be accessed without traversing upon—JR & Sons's property. To gain access to this loading dock, JR & Sons granted plaintiffs an express easement, recorded in the Town of Westerly's land evidence records, which "permit[s] ingress and egress to and from the loading dock at the southwest corner of [Butterfly Realty's] building[.]" This easement, however, expressly prohibits deliveries over the delineated route by "semi-trailers."

The testimony and evidence presented at trial established that, beginning in 1985 until the time of trial, Butterfly Realty's building was leased to a succession of businesses, all of which

used the loading dock for deliveries to their respective businesses. Each tenant received deliveries at the loading dock at varying frequencies from delivery trucks, including tractor-trailer trucks. In order to access the loading dock, these delivery trucks—including semi-trailers—would drive over JR & Sons's lot, outside the boundaries of the express easement. Thus, the evidence presented at trial clearly establishes that plaintiffs' use of lot No. 330 to reach the loading dock was adverse to the restrictions set forth in the recorded easement—and any understanding between the parties—ab initio.

Nevertheless, the trial justice concluded that the use of lot No. 330 to access the loading dock was actual, open, and notorious, but not sufficiently hostile to establish an easement by prescription. The trial justice explained that "Romanella's assent, accompanied with various restrictions, controlled the use of the area. * * * Being neighborly while actively controlling the use of one's property should not be construed as establishment of the hostility necessary to suffer the loss of a property right." He concluded that "Butterfly's use of the trucking routes, although exceeding the scope of the express easement, was not 'hostile' because Romanella implicitly permitted the use to continue." I am of the opinion that, in so finding, the trial justice clearly erred in that he overlooked and misconceived evidence on the controlling issues and law in this case. There simply is no evidence to support the finding that defendant employed "various restrictions" or "controlled the use of the area."

In Butterfly Realty v. James Romanella & Sons, Inc., 45 A.3d 584 (R.I. 2012) (hereinafter, Butterfly I), this Court explained that, "to show sufficient hostility, a claimant must, by clear and convincing evidence, demonstrate objective trespassory acts that are adverse to the rights of the true owner, not acts that are inconsistent to the use of the true owner." Id. at 590 (citing Reitsma v. Pascoag Reservoir & Dam, LLC, 774 A.2d 826, 832 (R.I. 2001)). However,

"[i]t is sufficient if one goes upon the land openly and uses it adversely to the true owner, the owner being chargeable with knowledge of what is done openly on his land." Id. at 589 (quoting Reitsma, 774 A.2d at 831). "Thus, to constitute hostile use, the claimant need only show a use 'inconsistent with the right of the owner, without permission asked or given, * * * such as would entitle the owner to a cause of action against the intruder [for trespass].'" Drescher v. Johannessen, 45 A.3d 1218, 1228 (R.I. 2012) (quoting Tavares v. Beck, 814 A.2d 346, 351 (R.I. 2003)).

This Court has previously been confronted with whether a landowner's use was permissive, thus defeating the element of hostility and a plaintiff's claim for possession. In Altieri v. Dolan, 423 A.2d 482, 484 (R.I. 1980)—on which the trial justice relied—this Court held that a prescriptive easement was not established where a shared driveway between neighbors "was used on a friendly and neighborly basis and not adversely." In reaching this conclusion, however, this Court specified that the plaintiffs failed to make the requisite showing of "some affirmative act constituting notice to [defendant] that their occupancy was hostile to the owner and they were claiming the property as their own." Id. (quoting Picerne v. Sylvestre, 122 R.I. 85, 92, 404 A.2d 476, 480 (1979)).

Again, in Burke-Tarr Co. v. Ferland Corp., 724 A.2d 1014, 1019 (R.I. 1999), this Court determined that "an inference of permissive use, which would defeat the element of hostile use" could not be drawn solely from a landowner's knowledge that a water line was being installed under a right of way that the landowner had leased to the defendant. In Burke-Tarr, not only did the landowner fail to object to the installation of the water line or to its continued use, but the landowner also testified that she did not know that the installed water line significantly exceeded the area specified in the leased right of way. Id. at 1020. As a result, this Court held that, in the

absence of an objection, a landowner's mere awareness of how his or her land is used is insufficient to establish express or implied permission which could negate hostile use. Id. at 1019-20.

Finally, in Reitsma, 774 A.2d at 832, this Court further explained that "[w]hen confronted with * * * an open, unsolicited, and long-continued use of the property, the true owner must affirmatively communicate either objection or permission to stop the statutory prescriptive period from running." (emphasis in original.) This Court specified that "[m]ere acquiescence or silence, however, in the face of uses that are inconsistent with the true owner's property rights, does not constitute permission." Id. In Reitsma, this Court concluded that "no inference of permission from [the defendant] could be drawn from the mere fact that [the defendant] allowed the use to continue." Id.

In this case, the trial justice noted that he was "not convinced that the owners or the employees of the parties knew the exact location of the easement at the time that Butterfly was using the disputed area." Indeed, neither Charles Sposato nor James Romanella, the current owners of JR & Sons, was aware that there even was an easement. Nonetheless, the evidence presented at trial established that tractor-trailer trucks regularly made deliveries to the loading dock via the brown route and the green route, in violation of the terms of the express easement for over twenty years, which is well in excess of the statutory period necessary to establish a prescriptive easement. The evidence also established that the current owners of JR & Sons had no idea that there was an express easement, along with its prohibition against semi-trailer trucks that was filed in the land evidence records. The record also shows that no express permission was given to plaintiffs to traverse lot No. 330 using the green and brown routes, nor was there ever an objection raised by defendant to this use.

Charles Sposato and James Romanella testified that each owned twenty-five percent of JR & Sons when Albert Romanella conveyed the property—and JR & Sons granted the easement—to Butterfly Realty in 1985. Their testimony indicates that they were uninformed and ignorant of the details of this transaction. Sposato testified that since that time, it was always his belief that Butterfly Realty should pay JR & Sons for its use of lot No. 330, and claims to have expressed this belief to Albert Romanella. Sposato did not disclose how Albert Romanella responded to this request. Sposato testified that after Albert Romanella died in 2004, he considered asking for rental payments, but never approached anyone from Butterfly Realty. Nonetheless, he testified at trial that, consistently for the past twenty-five years, he unequivocally believed that Butterfly Realty should be paying rent to JR & Sons for its use of lot No. 330:

> "Q: But your testimony is that for twenty-five years you thought they should have been paying rent; correct?
> "A: No question about it.
> "Q: And your attitude about it never changed in that twenty-five years? You always thought they should be paying money?
> "A: No question about it.
> "Q: It took you until 2010 to ask for it?
> "A: Because I had leverage then.
> "Q: You had leverage six years ago when Al Romanella died; didn't you?
> "A: We discussed it. We didn't do it."

This testimony is not that of a friendly neighbor.

In his deposition, Sposato claimed that an oral agreement existed between Albert Romanella and Mat Serra—who owned the liquor store on Butterfly Realty's property prior to 1985—that allowed trucks to drive onto lot No. 330 to access the loading dock. However, when asked when this purported oral agreement was reached between Romanella and Serra, Sposato testified:

"I never had a date. I never knew of a date that it was reached. It was just something that [James] and I had gotten from Albert that he had given to them people. * * * We never had any [sic] we didn't know where the lines were. We knew that they were on our property. * * * [B]ut I, I never knew Albert talked to them. He never told anybody. So, if he talked to them, I don't know when that was." (Emphasis added.)

This comment led to the following exchange:

"Q: So, from 1985 through the time that you called [the surveyor]—
"A: Yes.
"Q: —to locate the property line—
"A: Yup, I didn't know.
"Q: —you were operating under an understanding that there was some kind of oral agreement?
"A: That's how we addressed it. We never bothered anybody."
    (Emphasis added.)

At trial, however, when asked whether he knew of any agreement in place that permitted delivery trucks to traverse lot No. 330 to access the loading dock, Sposato flatly replied, "Not at all." Although the majority claims that this nebulous testimony establishes that Sposato "apparently believed" that Albert Romanella had already granted plaintiffs permission to traverse lot No. 330, our case law is clear that a landowner's subjective belief is insufficient to establish permissive use. See Reitsma, 774 A.2d at 832. And, in this case, Sposato was wrong. Our law therefore requires, when confronted with Butterfly Realty's "open, unsolicited, and long-continued use of the property," that JR & Sons "affirmatively communicate either objection or permission to stop the statutory prescriptive period from running." Id.

The evidence, however, clearly establishes that defendant did neither. According to Shawn Martin, neither Albert Romanella nor Sposato ever voiced an objection to the delivery trucks' use of lot No. 330 to access the loading dock. Indeed, there was no communication between these neighbors on this issue for twenty-five years. Martin's wife, Rita Martin—who

- 24 -

managed the liquor store from the time it opened in 1985 until its closing in 1989—testified that although she personally observed tractor-trailer trucks making deliveries to the loading dock, she had never received any written or oral communications from anyone affiliated with JR & Sons about the delivery trucks' use of lot No. 330 to access the loading dock. Paul Williams, who worked in the auto parts store for fifteen years—from 1991 until 2006—explained that the auto parts store received weekly deliveries at the loading dock from semi-trailer trucks that were approximately fifty feet in length. Williams also testified that he never had a conversation with anyone affiliated with JR & Sons concerning the trucks' deliveries to the loading dock. Finally, Craig Jackson, the owner of Auto Audio, testified that he also observed semi-trailer trucks at the loading dock on a weekly basis to make deliveries to the auto parts store. He maintained, however, that the only time he could recall deliveries being interrupted was when defendant installed the concrete pylons in 2010.

In addition, Sposato testified that, for more than twenty-five years, he personally observed tractor-trailer trucks traverse lot No. 330 to reach the loading dock on a weekly basis. He also testified that he never voiced an objection to plaintiffs' use of lot No. 330, nor did he make any attempt to stop delivery trucks from using the lot to reach the loading dock. Curiously, in the event his building was damaged by a delivery truck, Sposato claimed he would speak directly with the driver, and not with Butterfly Realty or its tenants. Thus, the record in this case clearly shows that defendant never raised an objection to plaintiffs' use of the disputed area as is required by our law. See Reitsma, 774 A.2d at 832.

Moreover, the evidence in this case also does not support the majority's conclusion that JR & Sons impliedly gave plaintiffs permission to use the disputed area, or that defendant's actions rose above the "inactive status of quiescence or unqualified submission" that is

insufficient to support an inference of permission. Reitsma, 774 A.2d at 832-33 ("Mere failure to protest is not permission but acquiescence. * * * Acquiescence is the inactive status of quiescence or unqualified submission to the hostile claim of another, and is not to be confused with permission, which denotes a grant of permission in fact or a license.") (quoting Garrett v. Gray, 266 A.2d 21, 27-28 (Md. 1970) (internal quotation marks and emphasis omitted)). In support of its holding that Charles Sposato and James Romanella "took affirmative steps consistent with an inference of permission," the majority first points to the fact that Sposato would move his car for delivery trucks traversing lot No. 330. However, the record reflects that this action was not necessarily taken for the purpose of allowing access to plaintiffs' loading dock. Rather, Sposato indicated that, although he would move his car so that traffic on lot No. 330 would not become congested, he could not identify whether the truck accessing the lot at the time was making a delivery to the Butterfly Realty building or to one of his own tenants. In fact, Sposato stated that vehicles—including tractor trailers—made deliveries to his own ten tenants on lot No. 330 by following the brown route. Likewise, when asked on cross-examination about the damage to his property—which he claimed was caused by deliveries made by tractor-trailer trucks to the Butterfly Realty building—Sposato admitted that vehicles making deliveries to his own tenants could have been responsible for the damage:

> "Q: I believe your testimony was to the effect that trailer trucks
>    making deliveries to the [Butterfly Building] caused the
>    concrete apron to break up; is that correct?
> "A: We believe the trucks going through there caused the concrete
>    ramp to break as you can see. We believe the trucks did that."
> "Q: Well, which trucks?
> "A: All I said was trucks did that. I don't know which truck did it.
> "Q: Well, was it trucks servicing [Butterfly Realty] or was it trucks
>    servicing your tenants that caused that?
> "A: I couldn't tell you. I really don't know which truck. I said
>    trucks did that not the cars.
> "Q: But—so it could have been your own tenants' deliveries that

caused that problem?

"A: Yes.

"Q: And you also testified, did you not, that trucks had hit your building?

"A: Yes.

"* * *

"Q: Was that—could that also have been any truck that did so?

"A: Could that also have been any truck? Of course."

The majority also points to conversations that James Romanella purportedly had to support its holding that defendant "took affirmative steps consistent with an inference of permission." I believe, however, that the majority's reliance on these conversations is misplaced, and similarly overlooks and misconstrues the material evidence presented in this case. For instance, the majority recounts that James testified in his deposition that, after instances in which his building was damaged by a delivery truck, he had two separate conversations with Paul Martin—first in 2001 and again in 2004—in which he claims that Martin apologized and promised "that he would make sure it didn't happen again." However, Paul Martin's testimony at trial reveals that, from 1985 to 2003, he had no involvement in Butterfly Realty. In fact, Martin's testimony reveals that he only acquired an interest in—and became involved in—Butterfly Realty in 2010. Furthermore, events that occurred in 2001—sixteen years after Butterfly Realty acquired the property—and in 2004—nineteen years later—are well beyond the statutory time period necessary to establish prescriptive use, and therefore have no bearing on whether the use was permissive. See G.L. 1956 § 34-7-1.

Nonetheless, the majority points to yet another purported conversation that James Romanella recounted at trial, in which he claims to have received a call from one of Butterfly Realty's tenants regarding whether delivery trucks could navigate lot No. 330 with the Christmas tree sales in place. This conversation occurred sometime during a twenty-year period:

"Q: Now, at any time did you ever have any conversations with anyone affiliated from Auto Zone regarding the Christmas tree

- 27 -

operation that you just described?

"A: Yes.

"Q: When did this occur?

"A: I'm not sure what year but obviously it was prior to 2005.
   * * * [I]t would [have been] between 1985 and 2005.

"Q: Okay. Do you know if it was in the 1990s, in the 2000s?

"A: I'm not sure."

Despite his inability to recall at what point in the twenty-year span this brief conversation occurred, Romanella detailed how he told the manager from Auto Zone "that it was my parking lot and that stand had been there year after year and it would continue as long as my tenant wanted to do it." In addition to relying on this nebulous testimony, the majority fails to recognize that this testimony at trial stands in stark contrast to James Romanella's deposition testimony—which was introduced into evidence at trial—in which he declared that, aside from the two aforementioned conversations with Paul Martin, he never had any other conversations with Martin or any affiliates, tenants, or co-owners of Butterfly Realty—including Auto Zone and Auto Audio—until the concrete pylons were installed. Thus, the record does not support the trial justice's conclusion—and the majority's affirmation—that defendant's "assent, accompanied with various restrictions, controlled the use of the area."

Finally, the majority concludes that Sposato's neighborly ways are what led him to never address anyone affiliated with Butterfly Realty or its tenants to voice an objection or stop the encroachment. Although the majority claims that Sposato "consciously refrained" from asking plaintiffs for compensation, the evidence presented at trial once again tells a different story. Sposato testified that it was always his belief that plaintiffs should pay for its use of JR & Sons's property, but that he never asked for rent from Butterfly Realty until approximately six months before trial, when he telephoned Paul Martin and demanded that Butterfly Realty pay $900 per month for its tenants' use of lot No. 330:

"Q: And your testimony here today is that you were voicing objections about Butterfly Realty and their tenants using your property to make deliveries and parking their cars twenty-five years ago?

"A: Did I? Are you asking me did I say that?

"Q: Yes.

"A: Yes, I did.

"Q: Okay. But the first time you ever addressed this issue with Butterfly was approximately six months ago; correct?

"A: That's what was prompted by what I told you because we thought they were using our property to park on, using our property to turn around on, coming up to the—and I said to my partner [James], and we both discussed it, if they are going to use that property they should pay us a rental and that brought my call to Paul Martin which I did."

In his deposition testimony, Sposato testified that, prior to this demand for rent money, he was unaware that there was an express easement from JR & Sons to Butterfly Realty, and was surprised to learn of the existence of the easement and of its terms. However, as soon as he learned about it, he made a hefty demand for $900 per month. When Butterfly Realty refused, JR & Sons installed concrete pylons along the express easement, making it impossible for any delivery vehicle to access the loading dock. When asked at trial why he installed the pylons, Sposato's response was about money: "I was trying to get together with Paul Martin and come to some kind of agreement for them using all of our property all the time, that's why I installed them so I'd obstruct the flow." This testimony mirrored Sposato's deposition testimony, in which he declared why he had the surveyor place an outline along the easement boundary: "Because we wanted compensation for using our property."

These uncontroverted facts chronicle that Sposato—as an owner of JR & Sons—was not trying to be neighborly; rather, he always wanted to be compensated for the use of lot No. 330. Nonetheless, he was ignorant of the dimensions of his own land and did nothing. The plaintiffs

used the area in a manner adverse to his ownership rights for over twenty-five years.[1]  Our case law is clear that JR & Sons's failure to effectively communicate permission or objection to stop the prescriptive clock from ticking is fatal to a finding of permissive use.  See Reitsma, 774 A.2d at 832 ("When confronted with * * * an open, unsolicited, and long-continued use of the property, the true owner must affirmatively communicate either objection or permission to stop the statutory prescriptive period from running."); see also Restatement (Third) Servitudes § 2.17 cmt. c. at 265-66 (2000) (as acknowledged in the majority's opinion, "[l]andowners are required either to formalize permissive arrangements, or to prevent use by others to avoid the risk that rights will be established by prescription").[2]  The evidence in this case clearly shows that defendant did neither.  Thus, absent permission or objection to plaintiffs' use, our case law is equally clear that defendant's mere awareness that tractor-trailer trucks traversed lot No. 330 to access the loading dock is insufficient to establish implied permission to negate plaintiffs' hostile

---

[1] Curiously, although Sposato testified that he personally constructed the building that houses his office on lot No. 330, he claims to have never noticed the express easement on any engineering drawing used in this construction.

[2] The majority cites § 2.17 of the Restatement (Third) Servitudes (2000) for the assertion that a recognized danger of prescriptive easements is their tendency to discourage "neighborly conduct and accommodation."  However, I believe that this language must be read in full context:

> "Prescription has both positive and negative effects. It encourages owners to prevent unauthorized users from developing reliance interests in continued use of their land, and it protects the reliance interests of those whose uses have continued without interruption for the prescriptive period.  On the negative side, it discourages neighborly conduct and accommodation.  Landowners are required either to formalize permissive arrangements, or to prevent use by others to avoid the risk that rights will be established by prescription.  Prescription tends to increase the costs of land ownership by creating a need for periodic monitoring to detect adverse uses.  On the positive side, prescription increases the security of arrangements based on long-continued uses and tends to increase the value of land served by the use."  Id. at 265-66 (emphases added).

use. See Burke-Tarr, 724 A.2d at 1020 (landowner's testimony that she was unaware that the installed water line significantly exceeded the area specified in the leased right of way, coupled with her failure to object to the installation of a water line or to its continued use, was insufficient to show permissive use). The record in this case is clear that JR & Sons did nothing to stop plaintiffs' adverse use until it was too late.

Moreover, I do not believe that this case presents the Court with an expansion of an express easement as the majority contends. It is undisputed that an express easement existed, permitting plaintiffs to access the loading dock from lot No. 330. However, it is also undisputed that the actual routes used by the delivery trucks—the green route and the brown route—did not follow, and occurred well outside of, the boundaries of the express easement, and operated in direct contravention of its specific prohibition against semi-trailers. I would therefore contrast this case from this Court's holding in Hilley v. Lawrence, 972 A.2d 643 (R.I. 2009), in which this Court stated that "[w]hen permission is granted for a particular use, a later use of the same kind cannot be characterized as adverse." Id. at 652 (citing Stone v. Green Hill Civic Association, Inc., 786 A.2d 387, 390 (R.I. 2001) (emphasis added)). As a threshold matter, the use of lot No. 330 by tractor-trailer trucks was without permission, in violation of the recorded easement, and was adverse to the landowner. See Drescher, 45 A.3d at 1228 ("[T]o constitute hostile use, the claimant need only show a use 'inconsistent with the right of the owner, without permission asked or given, * * * such as would entitle the owner to a cause of action against the intruder [for trespass].'") (quoting Tavares, 814 A.2d at 351). Moreover, despite the recorded easement's express prohibition against semi-trailers, evidence presented at trial clearly established that these types of trucks frequented the loading dock for decades without objection by defendant. See Reitsma, 774 A.2d at 832 ("Mere acquiescence or silence * * * in the face of

uses that are inconsistent with the true owner's property rights, does not constitute permission."). Moreover, I discern no evidentiary support for the trial justice's conclusion—and the majority's affirmation—that although the green and brown routes were used in full view of defendant, it "was done so with [its] permission." See id. ("When confronted with * * * an open, unsolicited, and long-continued use of the property, the true owner must affirmatively communicate either objection or permission to stop the statutory prescriptive period from running."). As such, I believe the plaintiffs have met their burden of showing that their use of lot No. 330 was hostile.

Accordingly, I am of the opinion that the trial justice erred in finding that there was implied permission for semi-trailer trucks to access the loading dock by traversing over lot No. 330 outside of the perimeters of the express easement. I am further unpersuaded that defendant's mere knowledge that trucks were traversing the lot created an implied permission sufficient to defeat plaintiffs' hostile use. See Burke-Tarr, 724 A.2d at 1019 (a landowner's knowledge of how his or her land is used, without a grant of permission or objection, is insufficient to establish express or implied permission).

Finally, although I acknowledge the majority's declared intention to charter "a consistent path by showing solicitude for the rights of record owners," I believe it should do so on the basis of the evidence in the record. Simply put, this case centers on a record wholly barren of evidence to support the majority's conclusion.

**Continuous Use**

Because I would hold that Butterfly Realty's use of the claimed area was hostile, it is also necessary to address the parties' arguments concerning continuous use before determining whether plaintiffs were in fact entitled to a prescriptive easement. See Butterfly I, 45 A.3d at 588 ("One who claims an easement by prescription bears the burden of establishing 'actual,

open, notorious, hostile, and continuous use under a claim of right for at least ten years.'")
(quoting Hilley, 972 A.2d at 651-52). In his decision, the trial justice determined that Butterfly
Realty had "failed to establish continued use for a period of ten years," finding that the yearly
Christmas tree sales had interrupted the continuous use of the disputed area. On appeal,
plaintiffs argue that the trial justice erred in finding that the Christmas tree sales interrupted
plaintiffs' continuous use of the area. I agree.

According to Rita Martin, for one month each year, during the Christmas season, tenants
of JR & Sons would sell Christmas trees alongside the northern side of the laundromat. She
described the area occupied by the trees as extending a "little beyond" the painted parking spaces
located on the northern side of the laundromat. At trial, Mrs. Martin sketched the approximate
area of the tree sales on a scaled map; according to her drawing, the trees did not overlap any
part of the brown route. She explained, however, that the actual dimensions of the area occupied
by the trees would vary slightly from one year to another. Nonetheless, she recounted that the
tree sales never hindered deliveries to the loading dock.

Paul Williams also testified about his observations of the annual Christmas tree sales. He
stated that the tree sales took place every Christmas season that he worked at the auto parts store,
and ran from the end of November through December. Like Mrs. Martin, Williams sketched the
location of the tree sales on a scaled map; this drawing depicted the trees encroaching upon the
brown route, but not blocking the route entirely. Williams stated that he had personally observed
trucks making deliveries while the trees were in place, but the trucks would have to "move[] over
a little" to avoid the trees. According to Williams, the space in between the trees and the
Butterfly Realty building was "a little tight," but that a semi-trailer truck could access the loading
dock. In fact, Williams insisted that the trees did not prevent the delivery trucks from entering

from East Avenue and reaching the loading dock.

As did Mrs. Martin and Williams, Craig Jackson, the owner of Auto Audio, also drew the area occupied by the Christmas trees on a scaled diagram. Jackson's sketch indicated that the trees did not encroach upon any portion of the brown route, and, depicted the "average" size of the Christmas tree display, because it varied from year to year. Jackson testified that, despite the Christmas tree display, the weekly deliveries to his store were never interrupted until defendant installed the pylons along the southwestern boundary of the easement.

Sposato testified that the Christmas tree sales took place on the northern side of the laundromat almost every year from 1985 to 2006, and lasted for approximately one month from Thanksgiving through Christmas Eve. When presented with Williams's drawing, Sposato indicated that the drawing was a "good illustration" of the area occupied by the Christmas trees. When asked about the trucks' ability to use the brown route while the trees were in place, Sposato stated, "[t]here's no room for anybody to really get through there in my opinion." He clarified, however, that he was "not saying that [the delivery trucks] didn't at times go through there because obviously they did, but not conveniently." Significantly, there was no testimony from James Romanella that the annual Christmas tree sales blocked access to the loading dock or that trucks were unable to pass over the brown route.

Our case law has recognized that one of the methods by which a record owner can interrupt a claimant's continuous use of a disputed area is by "physical ouster of the claimant or a 'substantial interruption' of the claimant's possession by the record owner." Carnevale v. Dupee, 783 A.2d 404, 409-10 (R.I. 2001) (quoting LaFreniere v. Sprague, 108 R.I. 43, 52, 271 A.2d 819, 824 (1970) (emphasis added)). This Court previously has found that a landowner's casual or passive attempts to interrupt a claimant's continuous use were not sufficiently

substantial so as to amount to an interruption of continuous use. See, e.g., Carnevale, 783 A.2d at 411 (the mere act of making a claimant aware of surveyed boundaries is insufficient to substantially interrupt the claimant's physical possession of the property); Jerry Brown Farm Association, Inc. v. Kenyon, 119 R.I. 43, 48, 375 A.2d 964, 966-67 (1977) (the placement of "a saw horse with a sign reading 'Road Closed' at the entrance to the road once a year," when "the saw horse only covered a small portion of the road" and "[v]ehicles desiring access would simply go around the sign," did not constitute substantial interruption); LaFreniere, 108 R.I. at 52, 271 A.2d at 824 (holding that performing a survey and giving notice to claimants of the proper boundary line did not constitute a sufficiently substantial interruption to halt the continuous use of the area, when claimants removed surveyor's stakes and continued to use the area in a similar manner); see also 25 Am. Jur. 2d Easements and Licenses § 62 at 559 (2004) ("Ineffective interruptions, such as the erection of barricades and gates that are ignored or destroyed, will not prevent a use from ripening into [a prescriptive] easement."). Accordingly, a landowner's actions to break a claimant's continuous use of a disputed area "must be such as to actually interfere with and interrupt substantially the claimant's use of the land."[3] LaFreniere, 108 R.I. at 53, 271 A.2d at 824.

In Butterfly I, 45 A.3d at 591, this Court determined that the factual findings of the trial justice were inconsistent with his conclusion that the annual Christmas tree sales interrupted Butterfly Realty's continuous use of the prescriptive area, and remanded the case with instructions to further examine the evidence and decide this issue. In the trial justice's second

---

[3] It is important to note that continuous and uninterrupted use by a claimant does not require constant use of the disputed area; "[i]t is necessary that it be continuous only in the sense that the claimant exercised a claim of right without interference at such times as it was reasonable to make a proper use of the land." LaFreniere v. Sprague, 108 R.I. 43, 53, 271 A.2d 819, 824 (1970).

decision, he once again determined that the plaintiffs' "use of the green and brown routes was not continuous for the statutory period of ten years," based on similar findings that, because of the Christmas tree sales, tractor trailers "sometimes had more difficulty" accessing the loading dock area, although "[s]maller trucks and consumer vehicles were still usually able to make it through this narrowed passage." However, there was no testimony or evidence presented at trial that the annual Christmas tree sales blocked access to the loading dock by delivery trucks sufficient to constitute an ouster. At best, the evidence suggested that the placement of the tree display merely made it inconvenient for trucks to access the loading dock. Inconvenience that does not rise to the level of physical ouster or substantial interruption as required by our case law is of no moment on the question of continuous use. Accordingly, it is my opinion that the trial justice erred when he found that the presence of the annual Christmas tree sales interrupted Butterfly Realty's continuous use of the green route and the brown route.

Lastly, the plaintiffs argue that its tenants' use of the claimed prescriptive area may be imputed to Butterfly Realty. However, after concluding that the plaintiffs failed to prove their claim for a prescriptive easement, the trial justice did not address on remand whether the various tenants' use of lot No. 330 could be imputed to Butterfly Realty. Because the trial justice did not reach the issue of imputed use, it is therefore unnecessary to address it.

**Conclusion**

Based on the foregoing, I am satisfied that the plaintiffs have established, by clear and satisfactory evidence, that their use of lot No. 330 was "actual, open, notorious, hostile, and continuous use under a claim of right for at least ten years." Butterfly I, 45 A.3d at 588 (quoting Hilley, 972 A.2d at 651-52).





**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**        Butterfly Realty et al. v. James Romanella & Sons, Inc.

**CASE NO:**        No. 2013-15-Appeal.
(WC 10-406)

**COURT:**        Supreme Court

**DATE OPINION FILED:**  July 1, 2014

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**        Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**    Washington County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Jeffrey A. Lanphear

**ATTORNEYS ON APPEAL:**

For Plaintiffs:  Mark E. Liberati, Esq.

For Defendant:  Kelly M. Fracassa, Esq.