**BUTTERFLY REALTY et al.**

v.

**JAMES ROMANELLA & SONS, INC.**

No. 2011–120–APPEAL.

Supreme Court of Rhode Island.

June 27, 2012.

Mark E. Liberati, Esq., Providence, for plaintiffs.

Kelly M. Fracassa, Esq., Westerly, for defendant.

Present: SUTTELL, C.J.,
GOLDBERG, FLAHERTY, ROBINSON,
and INDEGLIA, JJ.

## OPINION

Justice INDEGLIA, for the Court.

Before this Court is a dispute over the existence of an alleged prescriptive easement that is necessary for large commercial vehicles to get to the loading dock of a commercial building. The plaintiffs, Butterfly Realty and Dairyland, Inc., appeal from a judgment entered against them on their claims for a prescriptive easement on the property of the defendant, James Romanella & Sons, Inc. (JR & Sons or defendant). This case came before the Supreme Court on March 7, 2012, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After hearing the arguments of counsel and reviewing the memoranda submitted on behalf of the parties, we are satisfied that cause has not been shown. Accordingly, we shall decide .the appeal at this time without further briefing or argument. For the reasons set forth in this opinion, we vacate the judgment of the Superior Court.

## I

### Facts and Travel

The controversy involves three parcels of commercial real estate located in the Town of Westerly where East Avenue merges into Granite Street and further identified as lot Nos. 330, 331, and 332 on assessor's plat No. 77. *See* Appendix. Lot No. 330, the most southerly of the three lots, has frontage on East Avenue and is owned by JR & Sons. Situated upon the northern portion of lot No. 330 is a one-story metal commercial building containing a laundromat. Lot No. 331, owned by Dairyland, Inc. is located immediately north of lot No. 330 and has frontage on Granite Street. Lot No. 332, located immediately north of lot No. 331, is owned by Butterfly Realty. A single one-story commercial building straddles lot Nos. 331 and 332 and it occupies most of both lots. The building itself is owned by Butterfly Realty, and a small portion of it encroaches upon JR & Sons's adjacent lot.

On August 8, 1985, Butterfly Realty purchased the northernmost parcel, lot No. 332, from Albert Romanella, who, at the time, was president and 50 percent shareholder of JR & Sons. On that same date, Albert Romanella also assigned to Butterfly Realty his lease for the adjacent lot No. 331. Dairyland, Inc. was the owner of lot No. 331 at that time, and remains so today.[1]

Access to the loading dock at the rear of Butterfly's building is impossible without traversing onto JR & Sons's property to some degree because the commercial building was built so close to the common property line between lot Nos. 331 and 330. *See* Appendix. Therefore, on August 16, 1985, JR & Sons granted an express easement to Butterfly to provide access to the loading dock of Butterfly's commercial building. (The boundary of this express easement is shown by a broken line on the Appendix). The loading dock, located in the southwest portion of the building, faces south towards JR & Sons's property. The recorded easement provides for a passageway alongside the southern edge of the Butterfly building that ranges in width from approximately fifteen feet (on the

---

1. For the sake of simplicity, from this point forward, we shall refer to plaintiffs collective-ly as "Butterfly."

easterly end) to twenty feet (on the westerly end). The easement area then flares out to eventually become approximately forty-six feet in width. The easement, recorded in the Town of Westerly's land evidence records, explicitly permits:

"the continuance and maintenance of the building encroachment * * * and to permit ingress and egress to and from the loading dock at the southwest corner of [Butterfly's] building on said [l]ots 331 and 332 by vehicles and, on foot, but not semi-trailers, for loading and unloading equipment and merchandise for [Butterfly's] place of business and for no other purpose."

From 1985 through 1989, Shawn and Rita Martin operated a liquor store in the Butterfly building. Mr. Martin is an owner of Butterfly. During that time, various trucks made deliveries to the building's loading dock. Most of the deliveries were brought directly to the loading dock after crossing JR & Sons's property. After the liquor store vacated in 1989, other businesses leased the Butterfly building.

From 1991 through 2006,[2] AutoZone leased a portion of the Butterfly building and received deliveries by tractor trailers traversing JR & Sons's lot to reach the loading dock. From 1993 to 2010, a second tenant, Auto Audio, also occupied the Butterfly building. Its deliveries were made by "UPS trucks" that would likewise cross through JR & Sons's lot as they made their way to the loading dock. Auto-Zone and Auto Audio also shared the same trash-removal service, the trucks of which would remove trash every other week after reaching the loading dock by crossing JR & Sons's lot.

After a delivery truck struck a building on JR & Sons's property, JR & Sons surveyed the area in May 2010 to determine the precise location of the express easement. Then, in an effort to encourage Butterfly to "come to some kind of agreement for * * * using all of [its] property all the time," JR & Sons installed "concrete pylons" along the southwestern borders of the express easement—making it nearly impossible for trucks to continue to pull directly up to the loading dock, as had been done previously.

In response, on June 14, 2010, Butterfly sought a preliminary injunction to prohibit JR & Sons from interfering with its use of the disputed area to gain access to its loading dock. Butterfly's complaint also sought a declaratory judgment to quiet title to the disputed area and included a claim that it held a prescriptive easement over a portion of JR & Sons's property. With its answer, JR & Sons filed a counterclaim requesting a permanent injunction to prevent Butterfly from trespassing on its property. On December 8, 2010, a trial commenced in Washington County Superior Court. Over the course of the two-day bench trial, both Butterfly and JR & Sons presented witnesses who testified about the specific routes that various vehicles took to access the loading dock and about the frequency of such use. Trial testimony revealed the following facts.

Commercial vehicles would generally take one of two routes to get to the loading dock because of their size and the configuration of the Butterfly building and the laundromat. See Appendix. The parties referred to these two routes at trial and on appeal as the "brown route" and the "green route." A vehicle taking the

---

**2.** The record is unclear as to whether vehicles continued to traverse JR & Sons's property to gain access to Butterfly's loading dock between the years of 1989 and 1991. This ambiguity is not immediately fatal to this appeal because the latter period of 1991 through 2006 adequately satisfies the required ten-year time frame for prescriptive easements.

"brown route" would get to the loading dock by entering directly onto lot No. 330 from East Avenue, then proceed west between the two buildings, pull around to the west side of the laundromat, and then back up to Butterfly's loading dock. The "green route" would bring a vehicle directly onto lot No. 331 from Granite Street, where the vehicle would cross over several painted parking spaces[3] before entering lot No. 330, ultimately merging with the "brown route" between the Butterfly building and the laundromat. The vehicle would then follow the "brown route" by pulling around the laundromat and backing up to the loading dock.

Testimony at trial indicated that, from 1985 to 1989, the liquor store received deliveries at Butterfly's loading dock approximately twelve times a week, with trucks using both routes relatively equally. From 1991 to 2006, tractor trailers would make deliveries to AutoZone approximately once a week, again using both routes evenly. From 1993 to 2010, "UPS trucks" made deliveries to Auto Audio via the loading dock twice a day. The "UPS" deliveries were apportioned relatively evenly between the "green route" and the "brown route."

The trial also produced testimony that from 1986 through 2006, for approximately one month each year, JR & Sons's tenant sold Christmas trees inside a fenced-off area on the pavement immediately north of the laundromat. This area occupied at least six parking spaces next to the laundromat and extended beyond the parking spaces approximately ten feet. The exact perimeter of the tree-sale area varied in size each year.

The trial justice issued a written decision on March 18, 2011, denying Butterfly's claim for a prescriptive easement[4] and denying both Butterfly and JR & Sons's requests for injunctive relief. Final judgment was entered on March 23, 2011.

## II

### Standard of Review

"This Court gives great weight to the factual findings of a trial justice sitting without a jury in a civil matter, and we will not disturb such findings unless they are 'clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties.'" *Cahill v. Morrow*, 11 A.3d 82, 86 (R.I.2011) (quoting *Costa v. Silva*, 996 A.2d 607, 611 (R.I.2010)). "However, '[i]n contrast to our deferential stance vis-[a]-vis factual findings made by a trial justice, we review in a *de novo* manner a trial justice's rulings concerning questions of law.'" *Id.* (quoting *Costa*, 996 A.2d at 611).

## III

### Discussion

One who claims an easement by prescription bears the burden of establishing "actual, open, notorious, hostile, and continuous use under a claim of right for at least ten years." *Hilley v. Lawrence*, 972 A.2d 643, 651–52 (R.I.2009) (quoting *Nardone v. Ritacco*, 936 A.2d 200, 205

---

3. Although some of these parking spaces were located entirely on lot No. 331, several spaces extended onto JR & Sons's property.

4. In addition to claiming the existence of a prescriptive easement, Butterfly's amended complaint included claims of adverse posses-

sion, implied easement, easement by necessity, and easement by acquiescence. Regarding all of these other claims, the trial justice found in favor of JR & Sons. On appeal, Butterfly has elected to pursue only its claim for a prescriptive easement.

(R.I.2007)). Each element must be proved by the claimant "by clear and satisfactory evidence." *Id.* at 652 (citing *Nardone,* 936 A.2d at 205).

## A

### Hostility

■ After correctly reciting the elements of a prescriptive easement noted above, the trial justice, in his decision, examined Butterfly's claim for an easement by prescription. The trial justice's decision did not mention whether Butterfly met its burden of establishing actual, open or notorious use of JR & Sons's property. As to the continuous-use requirement, the trial justice only touched upon that element in stating that "the use never continued for a period of ten years." Indeed, the trial justice devoted most of his analysis evaluating whether Butterfly adequately satisfied the sole remaining element necessary to establish a prescriptive easement—hostility. On that issue, the trial justice ultimately found that Butterfly failed to present sufficient evidence for the court to conclude that its use of JR & Sons's land was sufficiently hostile.[5] In exercising our *de novo* review of the trial justice's application of law as it pertains to the hostility requirement in this case, we conclude that the trial justice erred.

■ For use of another's land to qualify as hostile, "[i]t is sufficient if one goes upon the land openly and uses it adversely to the true owner, the owner being chargeable with knowledge of what is done openly on his land." *Reitsma v. Pascoag Res-*

ervoir & Dam, LLC, 774 A.2d 826, 831 (R.I.2001) (quoting *Burke–Tarr Co. v. Ferland Corp.,* 724 A.2d 1014, 1020 (R.I. 1999)). "[T]he term 'hostile' does not connote a communicated emotion but, rather, action inconsistent with the claims of others." *Lee v. Raymond,* 456 A.2d 1179, 1183 (R.I.1983) (citing *Taffinder v. Thomas,* 119 R.I. 545, 552, 381 A.2d 519, 523 (1977)).

■ This Court recently clarified in a case deciding a claim of adverse possession[6] that "requir[ing] * * * a claim of right is the same as requiring hostility, in that both terms simply indicate that the claimant is [using] the property with an intent that is adverse to the interests of the true owner." *Cahill,* 11 A.3d at 89 (quoting *Tavares v. Beck,* 814 A.2d 346, 351 (R.I.2003)). "Thus, * * * a claim of right may be proven through evidence of open, visible acts or declarations, accompanied by use of the property in an objectively observable manner that is inconsistent with the rights of the record owner." *Id.* (quoting *Tavares,* 814 A.2d at 351). In *Reitsma,* 774 A.2d at 832, we suggested that the act of excluding or preventing the true owner from using the disputed land is simply one of many ways a party seeking a prescriptive easement could objectively act in a manner that is adverse to the true owner.

Here, the trial justice's analysis inappropriately required Butterfly's tenants' use of the disputed land to be inconsistent with JR & Sons's use for Butterfly to satisfy the hostility element. Specifically, the trial justice stated in his decision:

---

**5.** In his decision, the trial justice noted that, because "the facts of this case are largely undisputed, there [was] no need to comment on the credibility of the witnesses at length." Indeed, the trial justice found that there was "no reason to question the credibility of any of the witnesses."

**6.** In analyzing the elements required for a prescriptive easement, this Court may look to cases involving adverse possession because both legal doctrines share common elements of proof. *See, e.g., Palisades Sales Corp. v. Walsh,* 459 A.2d 933, 936–37 (R.I.1983).

"Here, the disputed area is a commercial lot, freely used by the tenants of all of the parties. It is also used by the tenants' customers while accessing the stores to the north and the south. This, in and of itself, is consistent with [JR & Sons's] rights and use of its own property. The use of this property was not sufficiently adverse to [JR & Sons's] rights so as to exclude or prevent [JR & Sons's] use of its property. Rather, it was entirely consistent with [JR & Sons's] use.

"There were only two periods where the use of the disputed area by Butterfly's tenants was inconsistent with [JR & Sons's] own use: When the trucks caused damage to [JR & Sons's] property and when the Christmas tree lot was in use. * * * The facts of this case simply do not allow any inference of hostile use or use under a claim of right. * * *

"Here, there is no hostility in any sense. The property was simply being used by delivery trucks and customers, a use totally consistent with the already existing use of the retail stores present in both lots."

The trial justice ultimately found that Butterfly failed to demonstrate that its tenants' use of JR & Sons's property was hostile.

■■■ According to the trial justice's interpretation of the law, for Butterfly to properly demonstrate that its tenants' use was adequately hostile, it would need to show how its tenants were using the disputed land in a way that was different from or inconsistent with JR & Sons's use.[7] There is no legal precedent, however, requiring Butterfly to prove that its

tenants' use was inconsistent with JR & Sons's use of the disputed area. In fact, in many prescriptive easement cases, the use made by the claimant is entirely consistent with the use made by the true owner. *See Jerry Brown Farm Association, Inc. v. Kenyon*, 119 R.I. 43, 375 A.2d 964 (1977) (affirming that a prescriptive easement existed over a private road by virtue of the claimants' use of the roadway in the same manner as the true owner). For purposes of establishing a prescriptive easement, both parties using disputed land in a similar way does not, in and of itself, defeat the required showing of hostility. Rather, this Court has long held that to show sufficient hostility, a claimant must, by clear and convincing evidence, demonstrate objective trespassory acts that are adverse to the rights of the true owner, not acts that are inconsistent to the use of the true owner. *Reitsma*, 774 A.2d at 832.

We conclude that this misapplication of law sufficiently tainted the balance of the trial justice's decision, including any factual determinations. However, because the parties briefed the subsequent issues on appeal, and to provide direction to the future trial court proceedings, we shall address the ensuing arguments set forth by JR & Sons.

**B**

**Christmas Trees & Continuous Use**

In its materials submitted to this Court, JR & Sons states that it "does not rely on the trial justice's legal conclusions set forth in his decision[.]" Instead, it argues that we should affirm the trial justice's decision based on his factual findings pertaining to whether the adverse use was sufficiently continuous. Specifically, JR &

---

7. Concerning the reference in the trial justice's decision that Butterfly's tenants failed to sufficiently "exclude or prevent [JR & Sons's] use of its property[,]" we reiterate that although exclusive use is an element of adverse possession, it is not necessary for establishing a prescriptive easement. *Gardner v. Baird*, 871 A.2d 949, 953 (R.I.2005).

Sons avers that the annual sale of Christmas trees effectively "interrupted the prescriptive timeline, negating the 'continuous' element" required for a proper showing of a prescriptive easement. To support this assertion, JR & Sons cites to one statement from the trial justice's decision, as well as portions of the trial testimony that suggest the Christmas trees blocked vehicular traffic to the loading dock.

On this issue, we begin by noting that factual findings by a trial justice receive great deference from this Court. *Cahill,* 11 A.3d at 86. Despite the extensive testimony at trial devoted to the size, extent, and frequency of the Christmas tree sales, and the resulting interaction with vehicles attempting to make deliveries to Butterfly's loading dock, the trial justice's decision includes only a single cursory statement pertaining to whether Butterfly's tenants' use of the disputed area was continuous—that "the use never continued for a period of ten years."

Furthermore, the trial justice's findings in reference to the annual Christmas tree sales that occurred on JR & Sons's property appear to this Court as inconsistent. In regard to the tractor trailers that made deliveries to AutoZone through the disputed area to the loading dock from 1991 to 2006 once a week, the trial justice found that "[t]hese trucks were about fifty feet long but were still able to navigate through the [JR & Sons] lot when the Christmas trees were present." Then, later in his decision, the trial justice remarked that "[t]he construction of the Christmas tree lot * * * stopped the Butterfly tenants from using the brown and green routes * * *."

Moreover, in his description of the layout where the Christmas trees were sold, the trial justice found that "[t]he fenced area [that contained the Christmas trees] extended beyond the parking spaces ap-proximately ten feet." Applying these dimensions to the Appendix, submitted as a full exhibit at trial, it appears that the Christmas tree sales would have had only a slight impact on the "brown route" and no impact at all on the "green route." This finding of the trial justice does not support his assertion later in the decision that the Christmas tree sales "stopped the Butterfly tenants from using the brown and green routes."

Because of these inconsistencies on the issue of whether the Christmas tree sales sufficiently interrupted the prescriptive use, we direct the lower court to further examine this issue in a manner that it deems most efficient.

## C

### Imputing Tenants' Prescriptive Use to Butterfly

JR & Sons also raises the argument that Butterfly cannot acquire a prescriptive easement based on the use of its lessees' delivery vehicles. To support this contention, JR & Sons cites to our holding in *Taffinder,* 119 R.I. at 550, 381 A.2d at 522, in which this Court held that for prescriptive rights to be established to the benefit of the landlord, the use of the disputed land must be included "either expressly or impliedly within the terms of the lease." This Court has further elaborated on this doctrine by holding that

"[a] long established 'use' pattern initiated by the landlord and continued by the tenants together with a physical appearance of the claimed easement in relation to the leased property which makes it reasonable to infer that the tenant believed the use of the land was covered by the tenancy are also circumstances which tend to support the con-

clusion that the easement was impliedly included in the tenancy." *Jerry Brown Farm Association, Inc.*, 119 R.I. at 50, 375 A.2d at 968 (quoting *Toto v. Gravino*, 144 A.2d 237, 239 (Del.Ch.1958)).

On remand, we direct the trial justice to make factual findings consistent with the foregoing interpretation of the law.[8]

## IV

## Conclusion

For the reasons set forth in this opinion, we vacate the judgment of the Superior Court and remand the case for proceedings consistent with this opinion. The papers in the case may be remanded to the Superior Court.

8. We emphasize that nothing in this decision is meant to alter or lessen the precedent established by our prior holding of *Cahill v. Morrow*, 11 A.3d 82 (R.I.2011). Although we dutifully vacate and remand the instant case because of the foregoing reasons, we recognize that "[p]rescriptive rights are not favored in the law * * * since they necessarily work corresponding losses or forfeitures of the rights of other persons." 25 Am.Jur.2d *Easements and Licenses* § 39 at 536 (2004).