July 3, 2025

**Supreme Court**

No. 2024-60-Appeal.
(NC 15-261)

(Concurrence and dissent
begins on Page 26)

Kristina Urbonas et al.                  :

v.                                       :

John Gullison et al.                     :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Kristina Urbonas et al.                    :

                    v.                      :

John Gullison et al.                       :


Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**   The defendant, NRI 51 Kingston Partnership (NRI),[1] appeals from a January 18, 2023 final judgment of the Superior Court, which awarded title to a portion of land to the plaintiffs, Kristina Urbonas and Arunas Aniukstis, which land had been considered by NRI to be its property.  The defendant contends that the trial justice "misapplied the doctrine of acquiescence" to the portion of land at issue.  The defendant further contends that the trial justice erred in awarding title to abutters other than the plaintiffs as said abutters had not requested such relief.

---

[1]     We preliminarily note that, in addition to NRI 51 Kingston Partnership (NRI), Gullison Realty, LLC, and John Gullison were named as defendants in the Superior Court.  However, NRI is the only appellant before this Court.

- 1 -

This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the written and oral submissions of the parties and after carefully reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument.

For the reasons set forth in this opinion, we affirm in part and vacate in part the judgment of the Superior Court.

## I

### Facts and Travel

Kristina Urbonas, one of the plaintiffs, purchased a parcel of real property located at 5 Bowser Court in Newport, Rhode Island, in 2006. Thereafter, in 2013, she conveyed that property to herself and her husband, Arunas Aniukstis. In April of 2008, John Gullison acquired property at 51 Kingston Avenue in Newport. Subsequently, in March of 2017, Mr. Gullison conveyed the 51 Kingston Avenue property to NRI. (Mr. Gullison has an ownership interest in and is the general manager of NRI.) The 5 Bowser Court property and the 51 Kingston Avenue property are adjacent to each other; the northeast border of 51 Kingston Avenue abuts the southwest border of 5 Bowser Court. Both properties abut Bowser Court, which is a rather narrow gravel road.

The controversy in this case arose in or around 2010, when Mr. Gullison decided to undertake certain renovations to his property. Before the renovations began, Mr. Gullison had a survey of his property conducted. The survey that was prepared depicted "a triangular piece of the cobblestone landing" of plaintiffs' entryway which encroached upon Mr. Gullison's property. Mr. Gullison's renovations involved leveling the ground in part of his backyard; that project involved digging up a portion of plaintiffs' cobblestone landing area that was encroaching upon his property. This, among other actions taken by Mr. Gullison, led plaintiffs to dispute the ownership of certain portions of the 51 Kingston Avenue property and Bowser Court.

On September 9, 2015, plaintiffs commenced the instant action against Mr. Gullison. The plaintiffs filed an amended complaint on December 7, 2016, in which they named the City of Newport, Sarah Mooradian, William Fitzgerald, Joan Jacobs, Rupert Nesbitt, James and Janice Barron, and the unknown heirs of Samuel DeBlois as additional defendants. In April of 2017, plaintiffs filed a second-amended complaint to correct the name of the last-referenced defendant to Silas D. DeBlois.

Later, on November 1, 2019, plaintiffs filed a third-amended complaint, in which they added Gullison Realty, LLC, The People's Credit Union, MERS as Nominee for Roundpoint Mortgage Co., MERS as Nominee for Guaranteed Rate, Inc., Savings Institute Bank and Trust Company, and NRI (the appellant) as

- 3 -

defendants. The plaintiffs' third-amended complaint sought the following relief: a declaration that, pursuant to the doctrine of acquiescence, they had acquired a five-foot strip of land from NRI which extended from Kingston Avenue to the front steps of 5 Bowser Court (Count I); a determination that they had acquired by adverse possession the five-foot strip of land and the above-referenced "landing" near plaintiffs' front steps (Count II); a determination that they had an easement by prescription across the five-foot strip of land and a narrow strip of land running along the northeastern and southwestern boundaries of the adjacent properties (Count III); a determination as to an alleged trespass by Mr. Gullison (Count IV); and injunctive relief (Count V).[2]

On November 19, 2019, a stipulation was filed dismissing defendant The People's Credit Union from the action. On December 11, 2020, a consent judgment was entered dismissing the City of Newport from the case. The defendants Rupert

---

[2] For the sake of completeness, we note that there were additional counts in the third-amended complaint—*viz.*, a determination under the doctrine of acquiescence relative to the portion of plaintiffs' property that was encroaching upon Bowser Court (Count VI); and a determination pursuant to the doctrine of adverse possession relative to the portion of plaintiffs' property that was encroaching upon Bowser Court and an approximate two-foot encroachment along NRI's northeastern boundary (Count VII).

Nesbitt, Janice Barron, the unknown heirs of Silas DeBlois, and Savings Institute Bank and Trust Company were all defaulted.[3]

Prior to the start of trial, the parties[4] filed a stipulation setting forth certain provisions that were to be included in the final judgment. The stipulation stated in pertinent part that final judgment would enter in favor of plaintiffs on Count VI and VII in that "the portion of real estate * * * including the overhanging [eaves] and steps to the entry way located at the [plaintiffs'] property which encroaches upon Bowser Court shall be declared to be adversely possessed by [plaintiffs] * * *." The stipulation further stated that the parties, including William Fitzgerald and Joan Jacobs, agreed that Bowser Court would be declared a private road.

A bench trial took place on September 27, 2022. The trial justice rendered a bench decision on October 14, 2022. We relate below the salient aspects of what transpired at the trial, and we summarize the testimony of the various witnesses in the order in which they testified.

---

[3] As will become clear *infra*, any claims relating to certain other defendants—*viz.*, MERS as nominee for Guaranteed Rate, Inc. and MERS as nominee for Roundpoint Mortgage Co.—were dismissed pursuant to the final judgment.

[4] In addition to plaintiffs, the following defendants signed the stipulation: Mr. Gullison, Gullison Realty, LLC, NRI, Sarah Mooradian, and MERS as Nominee for both Roundpoint Mortgage Company and Guaranteed Rate, Inc. It appears from the record that Ms. Mooradian, Mr. Fitzgerald, and Ms. Jacobs had ceased to be involved in the litigation.

# A

## The Testimony of Neal Hingorany

Neal Hingorany, a professional land surveyor who owns Narragansett Engineering Inc., was the first witness to testify. He testified that his firm was hired by plaintiffs in 2015 to conduct a survey of the 5 Bowser Court property. Mr. Hingorany stated that the survey revealed "two principle [*sic*] encroachments," the first being "the roof edge and gutter that encroached into Bowser Court. The second was the small portion of the steps and the cobblestone landing that also encroached into Bowser Court." Mr. Hingorany further testified that the survey also revealed a triangular encroachment of plaintiffs' cobblestone landing onto the 51 Kingston Avenue property. Mr. Hingorany further noted that plaintiffs were additionally claiming adverse possession over a 2.6-foot encroachment along the northeastern boundary of 51 Kingston Avenue.

# B

## The Testimony of Meredith Nina Keller

The plaintiffs next called Meredith Nina Keller to testify. Ms. Keller testified that, from the age of thirteen until she was nineteen-years-old, she lived at 6 Bowser Court across from plaintiffs' house. She added, however, that she had visited the 6 Bowser Court property frequently before the age of thirteen because her grandparents had purchased the 6 Bowser Court house in 1929. Ms. Keller also

testified that, even after she no longer lived there, she visited the 6 Bowser Court property frequently because her parents continued to live there. She stated that her father continued to live at 6 Bowser Court until 2005 and that her family owned the property until 2010. Ms. Keller additionally testified that she would visit Bowser Court twice a week from 2005 to 2010. Ms. Keller also recalled that Mr. Gullison "always had trucks blocking [Bowser] Court," which at one point adversely affected the delivery of oil to the 6 Bowser Court property.

It was Ms. Keller's testimony that, from the time she lived at 6 Bowser Court until her father moved out of the house in 2005, she did not observe any changes in the entryway and landing area of plaintiffs' house at 5 Bowser Court. According to Ms. Keller, the cobblestone landing area and the steps leading to plaintiffs' door had not changed from the time she was "a little girl" until 2010. She further testified that, ever since her girlhood, there had been a walkway about three feet in width, starting at the entryway of plaintiffs' house and ending at Kingston Avenue.

Ms. Keller also testified as to a photograph that she believed was from the 1950s (Exhibit 11). That photograph depicted a cobblestone walkway extending from the landing area of plaintiffs' house to the midpoint of the garage wall heading to Kingston Avenue; it also depicted a fence near the garage wall heading to the 5 Bowser Court property. Ms. Keller testified that the walkway was eventually overgrown with grass and that the fence ended up being torn down. On

cross-examination, when reviewing photographs taken more recently (Exhibit 10), Ms. Keller indicated that there was a tree near what had originally been the walkway as well as a pole where the fence had formerly been. She also noted that, in the more recent photographs, there was no longer a brick walkway; rather, she indicated that there was now a dirt path alongside the garage wall. Ms. Keller further testified that the front entrance of the 5 Bowser Court property was "the only entrance everybody ever went through."

## C

### The Testimony of John Gullison

Mr. Gullison testified as to the survey and the subsequent renovations that he made to his property. As previously noted, he discussed the removal of a portion of the cobblestone landing in front of plaintiffs' entryway. Mr. Gullison stated that, in addition to removing the cobblestones, he added gravel to the area. Mr. Gullison also removed a garage that was located on "the boundary of 51 Kingston Avenue and Bowser Court." Mr. Gullison testified that, after the renovations were completed, he put a copy of the survey along with a note into plaintiffs' mailbox.

Mr. Gullison testified that, in 2015, he removed an additional portion of the cobblestone landing area of 5 Bowser Court. He stated that he began to do further removal because there was a "change in demeanor in that the plaintiffs had asked the City to put a No Parking sign onto Bowser Court." At that point, all remaining

cobblestones which had been encroaching onto Mr. Gullison's property had been removed.  Mr. Gullison further testified that he placed two fence posts in the area that was "immediately adjacent to the steps to the 5 Bowser Court property."  He further testified as to a "stockade fence panel [that] was put up right directly * * * on [his] property line, but directly in front of the steps accessing 5 Bowser Court."  Mr. Gullison added that the fence was erected before this case had commenced, and he recalled that a temporary restraining order had issued, requiring him to take down that fence.  He further testified that, later, a preliminary injunction was entered, requiring him to take down a fence post.  Mr. Gullison stated that only one fence post remains, but he added that it was not obstructing access to the 5 Bowser Court property.  According to Mr. Gullison, plaintiffs then restored the cobblestone landing area.

Mr. Gullison stated that, at the time of the above-referenced dispute, he had tenants at the 51 Kingston Avenue property.  It was his testimony that he had become aware that plaintiffs "were having trouble because people were * * * blocking the way by the way they were parking."  Mr. Gullison testified that he had never noticed his tenants blocking Bowser Court.  However, when shown photographs that depicted vehicles parked on the 51 Kingston Avenue property that extended onto Bowser Court, he agreed that those vehicles obstructed access to 5 Bowser Court.

Later in the trial, after plaintiffs rested, Mr. Gullison was called to testify by the defense. He testified that he had no recollection of Ms. Urbonas ever contacting him after he had left the note in her mailbox.

**D**

**The Testimony of Kristina Urbonas**

Kristina Urbonas, one of the plaintiffs, was the next witness to testify at trial. Ms. Urbonas stated that, in 2010, she received a "notice" that Mr. Gullison had put "through [their] mail slot." According to Ms. Urbonas, shortly after receiving the "notice," she came home and observed that a "tree was gone, the whole area was excavated." She testified that, as a result of this action, she hired Mr. Hingorany to conduct a survey for her. She acknowledged that that survey did reveal that the cobblestone landing area was encroaching on 51 Kingston Avenue as well as Bowser Court.

Ms. Urbonas testified that she had reached out to Mr. Gullison concerning the removal of the cobblestone landing area. She indicated that Mr. Gullison did not provide "a nice response." Ms. Urbonas further stated that she informed Mr. Gullison that, "[i]f any further demolition will take place, we will go through the legal system." Ms. Urbonas testified that the "improvements or renovations" that Mr. Gullison made to the property included demolishing the garage, constructing an

- 10 -

addition to the house, and taking "all the dirt from his property and the street and level[ing] it down and put[ting] some stone so it just looks like a big parking lot."

Ms. Urbonas testified as to a photograph that she believed was taken in or about 2008, depicting the grass walkway from her house running alongside the garage. She further testified that, when she would park in either the front or back of the 5 Bowser Court property, she would use the walkway to access the house through the front door. Ms. Urbonas indicated that the front entrance and walkway to the 5 Bowser Court property was used only by plaintiffs and that they would clean the walkway when necessary. She stated that she used that grass walkway from 2006 to 2010 in order to place trash at the corner of 51 Kingston Avenue and Bowser Court. Ms. Urbonas indicated that no one lived at 51 Kingston Avenue from 2006 to 2010. It was her further testimony that, as of the time of trial, she would bring her trash to the corner of 47 Kingston Avenue and Bowser Court because the grass walkway was "blocked by cars."

According to Ms. Urbonas, after Mr. Gullison's renovations were completed, tenants came to reside at the 51 Kingston Avenue property, and issues relative to parking arose. Ms. Urbonas testified that the tenants of the 51 Kingston Avenue property blocked access to Bowser Court on fifty to seventy occasions. Having no knowledge that Bowser Court was private, Ms. Urbonas proceeded to "[file] a claim" at the Newport City Hall. Ms. Urbonas indicated that the City eventually installed

- 11 -

"No Parking signs." She added, however, that the installation of the signs did not always prevent the parking of vehicles.

Ms. Urbonas testified that, after Mr. Gullison had erected the fence pole that was in front of the steps leading to the entryway of her house, she sought a restraining order in order to have the fence and the fence pole taken down. She acknowledged that the fence was taken down after the restraining order was issued. Ms. Urbonas added that she had restored the landing area "to the condition that it was in 2010 after [Mr. Gullison] did his renovations."

**E**

**The Trial Justice's Decision and the Subsequent Travel of the Case**

After all the witnesses had testified, defendants[5] orally moved for judgment as a matter of law. In argument in support of their motion, defendants conceded that plaintiffs had proven a claim for adverse possession with respect to the cobblestone landing area. However, defendants contended that plaintiffs had failed to prove their remaining claims. The trial justice chose to reserve decision on the motion.

On October 14, 2022, the trial justice issued a bench decision. She first noted that, prior to the start of the trial, "all but three of the claims" had been resolved—the three unresolved claims being Count I, Count II, and Count III.

---

[5]     Even though the only appellant in this case is NRI, there were other defendants still involved in the litigation at the time of the motion for judgment as a matter of law; their arguments in support of same were identical to NRI's.

The trial justice first found that the strip of land that "was used as a walkway leading from Kingston Ave[nue] to the front steps of the plaintiffs' front door * * * has, in fact, been acquired through the doctrine of acquiescence." She then said: "And, I say that goes to plaintiffs but as well as to the other residents of Bowser Court." She found that the fence was an observable boundary marker that went back to "at the very least, the early to mid[-]seventies." The trial justice indicated that the existence and use of the walkway and fence satisfied the statutory time period, noting that she believed the walkway existed from "at least the mid[-]seventies." She further found that the predecessors in ownership of 51 Kingston Avenue had acquiesced to the walkway—"such that they have acquiesced or relinquished their right to maintain exclusive possession of that particular strip of land." The trial justice stated that said strip of land "has been forfeited by the defendant and should be included in the description of what is now known as Bowser Court."

On January 18, 2023, final judgment was entered.[6] Importantly, paragraph 5 of the final judgment further indicated that, under the doctrine of acquiescence,

---

[6] The judgment noted that the parties had agreed that plaintiffs and Ms. Mooradian, who was the owner of property located at 6 Bowser Court, have an easement over Bowser Court in order to access Kingston Avenue. The judgment also granted plaintiffs' claim for adverse possession with respect to their cobblestone landing and the portions of the house that encroached upon Bowser Court. The judgment additionally dismissed any claims against Ms. Mooradian, MERS as Nominee for Roundpoint Mortgage Co., and MERS as Nominee for Guaranteed Rate, Inc.

- 13 -

plaintiffs as well as other abutters of Bowser Court[7] were granted use of the walkway running from Kingston Avenue to the front steps of the 5 Bowser Court property. NRI filed a timely notice of appeal on January 27, 2023.

**F**

**The Request for Transcripts**

On September 27, 2023, plaintiffs filed a motion to dismiss NRI's appeal due to its failure to have timely transmitted the record or to have obtained an extension of the time within which to transmit the record. The defendants filed an objection to plaintiffs' motion, in which they stated that the "Appeal has not been docketed for Mediation." On December 1, 2023, defendant filed a "Motion for Extension of Time to File Transcript," to which plaintiffs objected. In its motion, defendant stated that this Court's "Mediation Office rejected the appeal for mediation and failed to notify the parties." On December 28, 2023, defendant filed a request for transcripts.

A hearing on plaintiffs' motion to dismiss and defendant's motion for an extension of time was held on January 2, 2024. A hearing justice, who was not the same as the trial justice, ordered that defendant had thirty days from January 2, 2024 to file a petition with this Court to seek an extension of time to file the transcript.[8]

_____

[7]     It can be inferred from the record that the other abutters were Sarah Mooradian, William Fitzgerald, and Joan Jacobs.

[8]     In view of our discussion of the timeliness issue *infra*, it is especially important to note that the Superior Court justice who presided at the January 2, 2024

That order, which was entered on February 19, 2024, further indicated that, if defendant failed to file "such a petition in the Supreme Court, or that petition is denied, the Plaintiffs' motion to dismiss * * * shall be granted."

On January 16, 2024, defendant filed in the Superior Court a "Miscellaneous Petition [for] Extension of Time to File Transcript."[9]   In that petition, defendant contended that the "Supreme Court Mediation Office rejected the appeal for mediation and failed to notify the parties that the matter was rejected."  The petition further indicated that the appeal was rejected by the Mediation Office in the erroneous belief that one or more of the parties was *pro se*.  The defendant asserted that, because the parties on appeal in this matter were in fact represented by counsel, it was requesting an extension of time to transmit the transcript or, in the alternative, referral to mediation.

On March 8, 2024, the completed transcripts relative to the appeal were filed in the Superior Court, and the case was certified to this Court on the same day.  The appeal was docketed in this Court on March 12, 2024.

---

hearing effectively granted defendants' motion for an extension of time for a finite period of time until a petition was filed in this Court.

[9]     It is significant that the January 16 petition for an extension of time contained a caption in large capital letters reading "SUPREME COURT."  We view that as an indication that the intention was that said petition would be filed in this Court rather than in the Superior Court.

- 15 -

## II

## Issues on Appeal

On appeal, defendant contends that the trial justice "improperly granted relief to the other abutters which was never requested." It further argues that the trial justice erroneously granted "title to the five (5) feet wide strip of [defendant's] lot to [plaintiffs] and the other abutters to Bowser Court under the doctrine of acquiescence." Thus, the only substantive issue for our review concerns the dispute over the five-foot strip of land utilized as a walkway.

The plaintiffs for their part contend that the instant case is not properly before this Court because defendant did "not receive[] an order from this Court extending the time" within which the filing of the transcripts would be permitted.

## III

## Standard of Review

This Court "will not disturb the findings of a trial justice sitting without a jury unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence." *Clark v. Buttonwoods Beach Association*, 226 A.3d 683, 690 (R.I. 2020) (quoting *Quillen v. Macera*, 160 A.3d 1006, 1010 (R.I. 2017)). Questions of law, by contrast, are reviewed in a *de novo* manner. *Id.*

## IV

## Discussion

## A

## The Transcripts

The plaintiffs contend that the instant case is not properly before this Court because defendant did "not receive[] an order from this Court extending the time by which they are permitted to file the transcript in this case." The plaintiffs candidly acknowledge that defendant did file a motion to extend the time within which to file the transcripts; however, they note that no ruling was ever made with respect to the motion to extend. The plaintiffs contend that this Court should deny defendant's motion because the transcripts were not requested until December 28, 2023 and were not filed with this Court until March 8, 2024. The plaintiffs argue that, consequently, defendant "has not timely filed the transcripts and its motion to extend time to transmit the record on appeal is not timely."

Article I, Rule 10(b)(1) of the Supreme Court Rules of Appellate Procedure provides that "within twenty (20) days after filing the notice of appeal," the appellant must order such transcripts of the proceedings "as the appellant deems necessary for inclusion in the record."

Rule 11(a) of the Supreme Court Rules of Appellate Procedure provides:

> "Except as provided for in Rule 35(e) with respect to cases eligible for mediation, the record on appeal, including the

transcript necessary for the determination of the appeal, shall be transmitted to the Supreme Court within sixty (60) days after the filing of the notice of appeal unless the time is shortened or extended by an order entered under subsection (c) of this rule."

Rule 11(c) states that the trial court "may extend the time for transmitting the record." The request for extension pursuant to Rule 11(c) "must be made within the time originally prescribed or within an extension previously granted, and the trial court shall not extend the time to a day more than ninety (90) days from the date of filing of the first notice of appeal."[10]

Rule 35(e) extends the time for ordering a transcript to sixty days from the filing of the notice of appeal for cases eligible for mediation; it also extends the time for transmitting the record to sixty days after the transcript has been ordered. Rule 35(e) also states: "The Rules of Appellate Procedure are not suspended during participation in the Appellate Mediation Program except as expressly provided for herein."

---

[10] Article I, Rule 11(c) of the Supreme Court Rules of Appellate Procedure also provides that, if "the trial court is without authority to grant the relief sought or has denied a request therefor, the Supreme Court may on motion extend the time for transmitting the record or may permit the record to be transmitted and filed after the expiration of the time allowed or fixed." Rule 11(f) further states that "[f]rom the time of the filing of notice of appeal, the Supreme Court and trial courts shall have concurrent jurisdiction to supervise the course of said appeal and to promulgate orders of dismissal of appeal for failure to comply with these rules, either upon motion of a party or upon the court's own motion."

In the instant case, the hearing justice in the Superior Court ordered that, beginning on January 2, 2024, defendant had thirty days to file a petition with this Court to seek an extension of time to file the transcript. The order further indicated that, if defendant failed to file "such a petition in the Supreme Court, or that petition is denied, the Plaintiffs' motion to dismiss * * * shall be granted." Two weeks later, on January 16, 2024, defendant filed in the Superior Court a "Miscellaneous Petition [for] Extension of Time to File Transcript." That document bore a caption indicating that it was meant for filing in this Court, although in actuality it was erroneously filed in the Superior Court.

It is our opinion that, while the petition for the extension of time (which stated on its face that it was designed for filing in this Court) was mistakenly filed in the Superior Court, that regrettable error should not be fatal to defendant's appeal. The language on the face of the petition suggests that the intention was for the document to be filed in the Supreme Court. For example, in addition to the fact that the caption reads "SUPREME COURT," the petition specifically requested that "this Honorable Court" grant relief in the form of allowing defendant an additional sixty days to submit the record to this Court or, in the alternative, referring the case back to the Appellate Mediation Program.[11] Moreover, the petition was filed on January 16,

---

[11] It is noteworthy that referring a case to the Appellate Mediation Program is a power that may be exercised only by this Court.

- 19 -

2024, which was within the prescribed thirty-day timeframe that was contained in the Superior Court's February 2024 order. In addition, it should be emphasized that the erroneous filing in no way adversely affected this Court's jurisdiction. The reality is that no action was taken in the Superior Court regarding defendant's petition for extension of time, and there was no petition of that nature filed in this Court. The case was certified to this Court on March 8, 2024, with no further action taken by either party.

For these reasons, we decline to dismiss defendant's appeal based on its initial untimeliness in requesting the transcripts. We emphasize that the travel of this case after judgment was rendered has been most unusual. It is our view that, given the unique circumstances that this case has presented, we are convinced that it is in the interest of justice to reach the merits of defendant's arguments. *See, e.g.*, *Wilkinson v. Harrington*, 104 R.I. 224, 230, 243 A.2d 745, 749 (1968) (stating that the attainment of justice "is the true purpose of a court's existence"). We therefore proceed to review defendant's substantive arguments on appeal.

**B**

**"The Other Abutters"**

The defendant first contends that the trial justice erroneously granted "the other abutters" relief which they had not sought. It will be recalled that, in paragraph 5 of the final judgment, the trial justice granted title to plaintiffs "and the other

- 20 -

abutters of Bowser Court * * * [to] that portion of * * * [defendant's] property that abuts Bowser Court, and which property formerly served as a walkway running from Kingston Avenue to the front steps of 5 Bowser Court property under the doctrine of [acquiescence]."

This Court has previously made clear that, "[u]nder the general principles of the adversary system, a party should not be granted relief that it did not request." *Providence Journal Company v. Convention Center Authority*, 824 A.2d 1246, 1248 (R.I. 2003). It has further been established by this Court that parties should be afforded notice and the opportunity to fully debate claims, which opportunity should include the ability to present relevant evidence. *See Atmed Treatment Center, Inc. v. Travelers Indemnity Company*, 285 A.3d 352, 365-66 (R.I. 2022).

After carefully reviewing the record, it is clear that the other abutters did not request the relief that the final judgment ultimately provided. Accordingly, we hold that the trial justice erred in granting the relief provided in paragraph 5 of the final judgment to "the other abutters to Bowser Court * * *."

## C

### Easement by Prescription

Lastly, defendant contends that the trial justice erred in applying the doctrine of acquiescence so as to "forfeit five feet of [defendant's] lot and merge it onto Bowser Court." Specifically, defendant points out that the owners of the properties

- 21 -

in dispute were "not adjoining estates" in that the area in question was between defendant's property and Bowser Court. The defendant further emphasizes that there was "no evidence submitted at trial that the parties' predecessors [had] ever mutually agreed to treat the rear fence and side of the garage as their common boundary." For their part, plaintiffs contend that they presented competent evidence to establish that they should be granted title to the five-foot walkway under the doctrine of acquiescence.

This Court has stated that the "doctrine of acquiescence provides that owners of adjoining estates are precluded from denying a boundary line recognized by both owners for a length of time equal to that prescribed by the statute of limitations barring a right of reentry." *DeCosta v. DeCosta*, 819 A.2d 1261, 1264 (R.I. 2003) (internal quotation marks omitted). This Court has further noted that "[a]lthough the original use of the parcel may be permissive, the doctrine of acquiescence provides that when there is an observable boundary line a claimant can gain title to the real estate encompassed by that boundary line, even though another party clearly possesses record title to that land." *Id.* (internal quotation marks and deletion omitted). Additionally, we have stated that the "party claiming ownership by acquiescence must show that a boundary marker existed and that the parties recognized that boundary for a period equal to that prescribed in the statute of limitations to bar a reentry, or ten years." *Id.* (internal quotation marks omitted).

In the instant case, it is not disputed that the respective properties of plaintiffs and defendant are adjoining lots. This Court also recognizes that competent evidence, both testimonial and photographic, was admitted at trial and that said evidence established that a fence and the side of a garage (neither of which currently exists) formed some type of boundary between defendant's property and Bowser Court. The evidence that was submitted also clearly establishes the existence of a walkway leading directly from the steps of plaintiffs' property to Kingston Avenue. Ms. Keller's unrebutted testimony in particular established that these specific markers were in existence for decades and were visible to the parties' predecessors. While this evidence satisfies virtually all of the elements of a claim of title to land under the doctrine of acquiescence, the boundary in dispute is not solely on the parties' adjoining lots. The five-foot strip of land that is in contention borders the properties only at the point where the walkway touches the entryway way of 5 Bowser Court, which entryway has been conceded (in paragraph 3 of the judgment) to be owned by plaintiffs. The common boundary of the area in dispute in reality lies between defendant's property and Bowser Court. The plaintiffs are therefore unable to satisfy all of the requisite elements of a claim made pursuant to the doctrine of acquiescence. For this reason, we hold that the trial justice erred in awarding title of the five-foot strip of land pursuant to the doctrine of acquiescence. However, our analysis does not end here.

This Court has stated that, "in reviewing [a] trial justice's legal determinations, this Court has a prerogative to affirm a determination of a trial justice on grounds different from those enunciated in his or her decision * * *." *Miller v. Metropolitan Property and Casualty Insurance Co.*, 111 A.3d 332, 339 (R.I. 2015) (internal quotation marks omitted). Although we have determined that the trial justice erred in applying the doctrine of acquiescence to the facts of this case, we hold that plaintiffs have established an easement by prescription over the five-foot strip of land.

This Court has stated that "[o]ne who claims an easement by prescription bears the burden of establishing actual, open, notorious, hostile, and continuous use under a claim of right for at least ten years." *Butterfly Realty v. James Romanella & Sons, Inc.*, 45 A.3d 584, 588 (R.I. 2012) (internal quotation marks omitted). The elements "must be proved by the claimant by clear and satisfactory evidence." *Id.* at 589 (internal quotation marks omitted).

As previously mentioned, the evidence that was admitted at trial establishes the existence of a walkway leading from the steps of plaintiffs' property to Kingston Avenue. Ms. Keller provided testimony that, from some point in time beginning in the 1960s until 2005, she observed no changes in the walkway of the 5 Bowser Court property. She specifically identified a photograph (which she believed was from the 1950s) that depicted a cobblestone walkway extending from the landing area of

plaintiffs' house to part of a garage wall. Additionally, there was photographic evidence from approximately 2008 that depicts a dirt walkway. As we have noted *supra*, this unrebutted testimony in particular established that this walkway had been utilized for decades and was visible to the parties' predecessors. In rendering her decision and applying the doctrine of acquiescence, the trial justice even noted that the evidence indicates that "it was agreed * * * by the predecessors in ownership * * * that [it] would be used as a walkway, and such that they have * * * relinquished their right to maintain exclusive possession of that particular strip of land."

In addition, Ms. Keller also provided testimony that the front entrance of the 5 Bowser Court property was "the only entrance everybody ever went through." Ms. Urbonas's own testimony established that they used the front door to gain access to the 5 Bowser Court property. She further testified that, irrespective of whether they parked in the front or the back of the house, they would "walk the [walk]way, go up and access the house through the front door." Ms. Urbonas also testified that the "entrance and the [walk]way * * * was always used by us only" and that they would clean the walkway when necessary. This testimony, viewed in its entirety, establishes the continuous, hostile use of the walkway as it was routinely utilized as a means of access to and egress from the main entrance of the 5 Bowser Court property. *See Reitsma v. Pascoag Reservoir & Dam, LLC*, 774 A.2d 826, 831 (R.I. 2001) (stating that, for the use of another's land to qualify as hostile, "[i]t is sufficient

- 25 -

if one goes upon the land openly and uses it adversely to the true owner, the owner being chargeable with knowledge of what is done openly on his land") (internal quotation marks omitted); *see also Butterfly Realty*, 45 A.3d at 590 ("[T]his Court has long held that to show sufficient hostility, a claimant must, by clear and convincing evidence, demonstrate objective trespassory acts that are adverse to the rights of the true owner * * *.").

For these reasons, we hold that the plaintiffs are entitled to an easement by prescription over the five-foot strip of land.

## V

## Conclusion

For the reasons set forth in this opinion, we affirm in part and vacate in part the judgment of the Superior Court. The record may be returned to that tribunal.

**Justice Long, concurring in part and dissenting in part.** I concur with my colleagues with respect to the conclusion that the trial justice erred in applying the doctrine of acquiescence to the five-foot walkway leading from Kingston Avenue to the plaintiffs' property. I write separately, however, because I cannot agree that the facts as found by the trial justice establish that the plaintiffs are entitled to a prescriptive easement over the walkway. I would, instead, remand the case for

- 26 -

further development of the factual record to determine whether such an easement is appropriate.

"This Court applies a deferential standard of review to the factual findings of a Superior Court justice sitting without a jury." *Red Gate Motel, Inc. v. Albanese*, 317 A.3d 1123, 1126 (R.I. 2024). In applying that deferential standard, we will not disturb the trial justice's factual findings without a showing that she or he overlooked or misconceived material evidence, or clearly erred in coming to her or his decision. *Id*. Because claims for prescriptive easements are "fact-intensive inquir[ies]," *Hazard v. East Hills, Inc.*, 45 A.3d 1262, 1271 (R.I. 2012), a trial justice's determination of whether a claimant has sustained their burden of proof "involves an exercise by the trial justice of [their] fact finding power," *Jerry Brown Farm Association, Inc. v. Kenyon*, 119 R.I. 43, 52, 375 A.2d 964, 968-69 (1977). "Accordingly, the deference that this Court affords the trial justice [in this context] is at its zenith." *Butterfly Realty v. James Romanella & Sons, Inc.*, 93 A.3d 1022, 1033 (R.I. 2014) (*Butterfly II*). Even if we would draw a contrary inference from the record, we are bound to uphold the trial justice's inferences so long as they are reasonable. *Jerry Brown Farm Association, Inc.*, 119 R.I. at 51, 375 A.2d at 968.

The trial justice's factual findings demonstrate that a walkway "from Kingston Ave[nue] to 5 Bowser Court * * * existed long before plaintiffs purchased the property" but that "it was difficult to pin down" for how long a fence existed to

- 27 -

separate defendant's lot from Bowser Court. The trial justice found that there is photographic evidence, dating to July or August 1975, depicting "that the fence and [a] garage were set back several feet from Bowser Court, allowing for the walkway * * *." However, the trial justice made minimal, if any, findings regarding the use of the walkway since 1975.

The trial justice found that Ms. Urbonas purchased 5 Bowser Court in May 2006 and regularly maintained "the area immediately adjacent to her home * * *." The trial justice observed that Ms. Urbonas "claims that since purchasing her property, she * * * would shovel the walkway from her home to Kingston Ave[nue] if there was excessive snow." However, in 2010 when Mr. Gullison began working on his property at 51 Kingston Avenue, "access to [Bowser Court] was routinely blocked." It is unclear from the trial justice's factual findings whether defendant's obstruction of Bowser Court also blocked the walkway, which is parallel to Bowser Court.

The trial justice determined that, sometime in 2010, Mr. Gullison began excavating the land immediately adjacent to plaintiffs' property, removing from that area (1) a tree that the trial justice inferred had been growing since at least 1975, and (2) a portion of a cobblestone landing at the base of stairs leading into 5 Bowser

Court.[1]  Mr. Gullison also "placed down gravel" and leveled the area in front of the stairs leading into 5 Bowser Court, and placed railroad ties on the northerly portion of the Kingston Avenue lot; however the trial justice made no findings with respect to whether the gravel and railroad ties were placed on the walkway, or what impact those changes had on plaintiffs' use of the walkway.  The trial justice further recounted that, as part of Mr. Gullison's construction, he "became aware of plaintiff's encroachment on his lot and notified her of the same by leaving her a copy of a survey or plat map detailing the areas of encroachment * * *."  That plat map "indicated that the cobblestone landing that had been installed by the plaintiffs extended 3.6 feet onto defendant's property."  Once again, it is unclear from the trial justice's findings whether the act of providing the plat map constituted a revocation of permission to use the walkway, or whether Mr. Gullison communicated anything with respect to the walkway at the time he gave plaintiffs the plat map.

Finally, the trial justice found that, a few years later, in 2015, Mr. Gullison "returned to the disputed area," removed the railroad ties, and built a fence along the northeastern portion of his boundary line, which "left approximately a foot and-a-

---

[1] Multiple undated photographs admitted into the record depict what appears to be a mature tree standing directly in front of the stairs leading into 5 Bowser Court.  That placement likely would have affected plaintiffs' use of the walkway and access to the stairs leading into 5 Bowser Court, but the trial justice made no finding of fact with respect to how the tree's location impacted plaintiffs' use of the walkway or access to the stairs.

half between plaintiffs' home and the fence" and "cut off [plaintiffs'] access to the stairs leading into [the] front door." Again, the trial justice made no findings regarding how construction of the fence impacted plaintiffs' use of the walkway. After Mr. Gullison built the fence, plaintiffs filed the instant action and thereafter secured injunctive relief requiring him to remove the fence and "preventing him from taking any action which would obstruct plaintiffs' access to the entry of their property." It is at best ambiguous whether the trial justice's reference to "access to the entry of their property" referred to the walkway along defendant's property, the cobblestone landing, or the physical entryway into 5 Bowser Court.

The trial justice examined plaintiffs' three related claims for a prescriptive easement, ownership by adverse possession, and the doctrine of acquiescence, but found that plaintiffs had acquired the walkway only pursuant to the doctrine of acquiescence. Specifically, she concluded that

> "the walkway adjacent to the fence leading from 5 Bowser Court to Kingston Ave[nue] was in existence going back, once again, to at least the mid seventies. So, certainly -- and I say that because it satisfies the statutory time period. But, that that, in and of itself, it was agreed that it was acquiesced by the predecessors in ownership to the 51 Kingston Ave[nue] lot, that that would be used as a walkway, and such that they have acquiesced or relinquished their right to maintain exclusive possession of that particular strip of land."

In clarifying her order, the trial justice stated that Mr. Gullison's

- 30 -

> "right to claim exclusive possession of [the walkway], he has forfeited because * * * his predecessors in title * * * have acquiesced to claiming exclusive ownership over that, and that, in fact, it was used as part of, I would say, the common area described as Bowser Court."

Significantly, the trial justice granted plaintiffs a prescriptive easement only with respect to a 2-foot 8-inch strip of land at the rear of defendant's lot that was used to access an oil tank spigot.

This Court has repeatedly explained that establishing a right to another's land by a prescriptive easement is "not favored in the law, since [it] necessarily work[s] corresponding losses or forfeitures on the rights of other persons." *Butterfly II*, 93 A.3d at 1030 (brackets and deletion omitted) (quoting *Drescher v. Johannessen*, 45 A.3d 1218, 1227 (R.I. 2012)). "[O]ur jurisprudence on prescriptive rights in recent years has charted a consistent path by showing solicitude for the rights of record owners, and, correspondingly, guarding against the potential for uncompensated loss by holding claimants to a high burden of proof." *Id*. at 1030. "[O]ne who claims an easement by prescription has the burden of establishing actual, open, notorious, hostile and continuous use under a claim of right for ten years * * *." *Reitsma v. Pascoag Reservoir & Dam, LLC*, 774 A.2d 826, 831 (R.I. 2001) (quoting *Burke-Tarr Co. v. Ferland Corp.*, 724 A.2d 1014, 1020 (R.I. 1999)). Each element must be established by clear and convincing evidence. *Carpenter v. Hanslin*, 900 A.2d 1136, 1146 (R.I. 2006).

"No particular act to establish an intention to claim ownership is required," rather, "[i]t is sufficient if one goes upon the land openly and uses it adversely to the true owner * * *." *Carpenter*, 900 A.2d at 1147 (quoting *Reitsma*, 774 A.2d at 831-32). Where courts are confronted with an "open, unsolicited, and long-continued use of the property, the true owner must *affirmatively communicate* either objection or permission to stop the statutory prescriptive period from running. Mere acquiescence or silence" in the face of that use "does not constitute permission." *Reitsma*, 774 A.2d at 832. Moreover, this Court has clarified, and Rhode Island statutes mirror, that actual use cannot be established solely by foot traffic. *Carpenter*, 900 A.2d at 1147; G.L. 1956 § 34-7-4 ("No right of footway, except claimed in connection with a right to pass with carriages, shall be acquired by prescription or adverse use for any length of time."); *see also Rhode Island Mobile Sportfishermen, Inc. v. Nope's Island Conservation Association, Inc.*, 59 A.3d 112, 121, 123 (R.I. 2013) (vacating trial justice's finding that the plaintiffs obtained prescriptive easement where trial justice did not articulate whether the plaintiff's use of disputed area was by foot traffic, which would not establish use, or vehicle, which could, and remanding case).

In my view of the record, the trial justice has not made sufficient factual findings for this Court to credibly identify whether plaintiffs have met the elements to establish their right to a prescriptive easement over the walkway by clear and

convincing evidence. It is apparent from the trial justice's decision that she considered plaintiffs' claims for prescriptive easements as part of her analysis, but concluded that plaintiffs had established a prescriptive right only to the 2-foot 8-inch strip at the rear of defendant's lot, and not to the walkway. Unless we conclude that the trial justice overlooked or misconceived material evidence in reaching this conclusion, I believe her decision is entitled to considerable deference because it is the kind of fact-intensive inquiry that this Court typically leaves to a trial justice. *Jerry Brown Farm Association, Inc.*, 119 R.I. at 51-52, 375 A.2d at 968.

To the extent that the trial justice has made factual findings relative to plaintiffs' prescriptive rights over the walkway, those findings are, at best, ambiguous with regard to whether plaintiffs or their predecessors in interest actually used the walkway, or used it in a manner that was hostile to the true owner. The trial justice made no findings of fact about the frequency, extent, and character of plaintiffs' use of the walkway, observing only that Ms. Urbonas claims that she cleared the walkway if it was covered by excessive snow; and inferring that plaintiffs' predecessors in interest used the walkway to get to and from Kingston Avenue since at least the mid-1970s. *See Carpenter*, 900 A.2d at 1147 (holding that actual use sufficient to establish a prescriptive easement must be adverse to the true owner, under a claim of right, and cannot be established by foot traffic alone). By contrast, when the trial justice concluded that plaintiffs had established a prescriptive

right to the 2-foot 8-inch strip in the rear of defendant's lot, she specifically found that plaintiffs "cleaned this area, maintained the landscape, [and] planted certain shrubs[,]" all of which contributed to her conclusion that plaintiffs' use was "consistent with how owners of property would use their land."

Moreover, the trial justice did not make any factual findings with respect to whether plaintiffs' use of the walkway was hostile to defendant's rights or the rights of defendant's predecessors in interest. "To demonstrate hostile use, the claimant must show use 'without permission asked or given * * * such as would entitle the owner to a cause of action against the intruder [for trespass].'" *Butterfly II*, 93 A.3d at 1032 (quoting *Drescher*, 45 A.3d at 1228). Here, the trial justice's supportable findings do not establish that plaintiffs or their predecessors in interest committed a trespassory act. Rather, the only finding on the record establishes that it was agreed to that defendant's predecessors had relinquished exclusive possession of the walkway to plaintiffs' predecessors dating back to 1975. *See Bennett v. Napolitano*, 746 A.2d 138, 141 (R.I. 2000) (defining a "trespasser" as "one who intentionally and *without consent or privilege* enters another's property") (emphasis added) (brackets omitted); *see also Altieri v. Dolan*, 423 A.2d 482, 484 (R.I. 1980) (holding that a prescriptive easement had not been established where a shared driveway was used on a friendly and neighborly basis and not adversely). I therefore cannot conclude

that plaintiffs have established their hostile use of the walkway by clear and convincing evidence.

Additionally, this Court has said that, when faced with an "open, unsolicited, and long-continued use of the property, the true owner must *affirmatively communicate* either objection or permission to stop the statutory prescriptive period from running." *Reitsma*, 774 A.2d at 832. We have also said that plaintiffs seeking a prescriptive easement must show "some affirmative act constituting notice to [a defendant] that their occupancy was hostile to the owner and they were claiming the property as their own." *Altieri*, 423 A.2d at 484 (quoting *Picerne v. Sylvestre*, 122 R.I. 85, 92, 404 A.2d 476, 480 (1979)). Here, the trial justice found that defendant's predecessors in interest had acquiesced to the use of the walkway by plaintiffs' predecessors. But the trial justice did not find that defendant affirmatively communicated any objection to plaintiffs' continued use of the walkway, nor did she find that plaintiffs had made an affirmative act claiming the walkway as their own. In order to establish hostility after plaintiffs' and their predecessors' accepted, decades-long use of the walkway, plaintiffs were required to show that defendant had affirmatively communicated an objection to their continued use, but there are no findings suggesting this occurred. *Reitsma*, 774 A.2d at 832. For this additional reason, I cannot agree that plaintiffs have established the hostility element of their prescriptive easement claim by clear and convincing evidence.

In an effort to reach a resolution to this decade-long litigation, the majority finds its own facts from the record to support the plaintiffs' effort to establish a prescriptive easement. However, when reviewing the findings of a trial justice sitting without a jury, this Court gives great weight to the justice's findings and will not disturb them unless we conclude that the trial justice's findings of fact and conclusions of law were clearly wrong. *Altieri*, 423 A.2d at 484. This is particularly true in the context of a claim for a prescriptive easement where the trial justice's fact finding power is at its zenith. *Butterfly Realty II*, 93 A.3d at 1033. Accordingly, I would give the facts as found by the trial justice the weight they are due and, as we have done in other prescriptive easement cases where a trial justice made incomplete factual findings, I would remand this case so that the trial justice may have an opportunity to make this fact-intensive determination in the first instance. *See Butterfly Realty v. James Romanella & Sons, Inc.*, 45 A.3d 584, 591 (R.I. 2012) (vacating judgment on prescriptive easement and remanding so trial justice could make further factual findings with respect to specific elements of the claim). Because of the limited factual record before us, I respectfully dissent from the majority's conclusion that the plaintiffs are entitled to a prescriptive easement over the walkway.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Kristina Urbonas et al. v. John Gullison et al. |
| **Case Number** | No. 2024-60-Appeal.<br>(NC 15-261) |
| **Date Opinion Filed** | July 3, 2025 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Newport County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Maureen B. Keough |
| **Attorney(s) on Appeal** | For Plaintiffs:<br><br>Joseph F. Hook, Esq. |
| | For Defendant:<br><br>Jeremiah C. Lynch, III, Esq. |